**F I L E D**

**PUBLISH**

**AUG 24 2001**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EUGENE SCHRODER; EDWIN
PETROWSKY; R. RUSSELL
GRIDER; and WESLEY MYERS,

     Plaintiffs-Appellants,

v.

GEORGE W. BUSH, President of the
United States; ANN M. VENEMAN,
United States Secretary of Agriculture;
PAUL H. O'NEILL, United States
Secretary of the Treasury;[*] and
UNITED STATES OF AMERICA,

    Defendants-Appellees.

No. 00-1357

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 00-K-154)**

---

Walker Fowler Todd, Chagrin Falls, Ohio, for Plaintiffs-Appellants.

Peter J. Krumholz, Assistant United States Attorney (Thomas L. Strickland,
United States Attorney, with him on the brief), Denver, Colorado, for Defendants-
Appellees.

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), George W. Bush is substituted for
William J. Clinton, President of the United States; Ann M. Veneman is
substituted for Daniel R. Glickman, United States Secretary of Agriculture; and
Paul H. O'Neill is substituted for Lawrence Summers, United States Secretary of
the Treasury, as Defendants-Appellees in this action.

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **BRIMMER**,[**] District Judge.

**EBEL**, Circuit Judge.

Appellants are farmers or ranchers who live and work within the territorial boundaries of the Tenth Circuit and who seek declaratory and injunctive relief against the President of the United States, the United States Secretary of Agriculture, the United States Secretary of the Treasury, and the United States of America (collectively, "Appellees"). Appellants seek, in essence, an order requiring Appellees and their agents to maintain market conditions favorable to small farmers. The district court dismissed for lack of subject matter jurisdiction, writing, "The Complaint seeks to have this court determine political questions which are properly addressed [by] the elected branches of the government. This Court has no jurisdiction over the discretionary acts of either. Plaintiffs' remedies are at the polling place, not the courts." Schroder v. Clinton, No. 00-CV-154-K (D. Colo. July 6, 2000) (hereinafter "D.Ct. Order"). We agree that Appellants ask us to consider nonjusticiable political questions and that

---

[**]The Honorable Clarence A. Brimmer, Jr., United States District Judge for the District of Wyoming, sitting by designation.

Appellants must seek relief from the elected branches of government. We therefore AFFIRM the district court's dismissal.[1]

## BACKGROUND

A.  Plight of the Small Farmer in America

Every branch of the federal government has recognized how difficult it is for small farmers to make a living by farming.[2] See William J. Clinton, State of the Union Address of January 27, 2000, reprinted in 2000 U.S.C.C.A.N. D7, 2000 WL 85684, *11 ("[D]roughts, floods, and historically low prices have made these times very bad for the [family] farmers."); S.J. Res. 171, 103rd Cong. (1994)

---

[1]Deeply rooted ambiguity in the nature and justification of the political question doctrine has prevented clear classification of the appropriate type of dismissal in political question cases. See Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3534.3, at 517-525 (2d ed. 1984)  We agree with Wright & Miller's conclusion that, in the end, clear classification is immaterial: "[T]here is probably more room for confusion than benefit in attempting to analogize [political question dismissal] to dismissal for failure to state a claim, or to dismissal for lack of jurisdiction.  Some cases will be appropriate for dismissal on the pleadings, others will require further development . . . ." Id. at 525; cf. Daniel O. Bernstine, The Political Question Doctrine: A Perspective on its Procedural Ramifications, 31 U. Kan. L. Rev. 115, 129-30 (1982) (concluding that dismissal for subject matter jurisdiction is appropriate if the claims fall within an established category of political questions or are frivolous, but that, otherwise, dismissal for failure to state a claim is appropriate).

[2]Indeed, three of the four Appellants have other jobs besides farming: Schroder is also a veterinarian; Petrowsky is also a nuclear engineer and aerial photographer; and Myers has also been a county sheriff.

(1994) (joint proclamation of "Small Family Farm Week") (stating "the plight of the small family farmer has been in jeopardy in recent times [and] many small family farms continue to operate in the face of financial and credit difficulties"); Mulroy v. Block, 574 F. Supp. 194, 195-96 (N.D.N.Y. 1983) ("[I]n a time when this nation is experiencing the decline and threatened extinction of the individual farmer, it is particularly disturbing to see legislation such as this which will undoubtedly have a devastating effect on the small scale dairy farmers of this nation."); In re Moeller, No. 90-35017, 1990 WL 208617, at *1 (9th Cir. Dec. 14, 1990) ("Appellants made spirited arguments before this court regarding the plight of family farmers who have successfully farmed the same land for generations. We sympathize with their concerns."). In a similar case from 1988, we acknowledged our awareness of "the serious plight of the family farmer in America. We sympathize with farmers struggling to secure their livelihoods and, more fundamentally perhaps, maintain their way of life." Schroder v. Volcker, 864 F.2d 97, 99 (10th Cir. 1988).[3] A 1998 report from the United States Department of Agriculture demonstrates that, more than a decade after Schroder,

---

[3]Despite the superficial similarities in Schroder v. Volcker and Schroder v. Bush of name and kind of case, see 864 F.2d at 98 ("Plaintiffs' claims constitute a broad scale attack against the agricultural credit system in particular, and the American banking and economic systems in general."), the two cases do not seem related. Appellants' first names in Schroder v. Volcker were Derral and Gladys, while the Schroder in this case is named Eugene.

times are still hard for small farmers in America: "Today, we have 300,000 fewer farmers than in 1979, and farmers are receiving 13 percent less for every consumer dollar. Four firms now control over 80 percent of the beef market. About 94 percent of the Nation's farms are small farms, but they receive only 41 percent of all farm receipts." Nat. Comm'n on Small Farms, U. S. Dep't of Agric., A Time to Act: A Report of the USDA National Commission on Small Farms, at 8 (Jan. 1998).

We remain sympathetic to the plight of the small farmer, but we also remain in agreement with the judgment of both the district court in this case and the Schroder court thirteen years ago: "[W]e believe the issues raised by plaintiffs in this suit are basically political questions which must be resolved in the legislative arena." Schroder, 864 F.2d at 99.[4]

B. Relief Sought by Appellants

Appellants – Eugene Schroder from Campo, Colorado; Edwin Petrowsky from Pratt, Kansas; R. Russell Grider from Clovis, New Mexico; and Wesley Myers from Clovis, New Mexico – sought "a moratorium on farm foreclosures[[5]]

---

[4]Appellants acknowledge that they have sought relief via political channels. Despite their initial lack of success, we believe our constitutional system requires that they stay that course.

[5]In their Complaint, Appellants sought a moratorium on "all agricultural
(continued...)

and an order requiring the President, Secretary of the Treasury, Secretary of Agriculture, and their agents to control United States currency and to maintain market conditions so as to be favorable to American farmers." They admitted that controlling currency and maintaining favorable market conditions "would require congressional or judicial review of agricultural product and marketing controls, bilateral trade agreements that affect U.S. agriculture, the activities of the Exchange Stabilization Fund, and enforcement of the anti-trust laws by the U.S. Department of Justice with respect to corporate competitors of family farmers . . . ." They sought a permanent injunction "requiring the Secretary of the Treasury and the U.S. Trade Representative . . . of the President to work together and cooperate in negotiating and implementing foreign trade agreements" that would benefit small farmers.

Appellants alleged that a national emergency in Agriculture was declared "on May 12, 1933, and has yet to be terminated 66 years later," and requested a

---

[5](...continued)
foreclosures and forced sales caused by lack of purchasing power parity." On appeal, however, they refined this prayer for relief to "a moratorium on federally funded farm foreclosures." We find the addition of no import, but even if we did, generally we will not consider new theories on appeal. See Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1314 n.4 (10th Cir. 1998). This observation – that we generally refuse to consider new theories on appeal – applies with equal force to the other minor changes Appellants made to their request for relief on appeal. Because their requested relief, regardless of whether they requested it in their Complaint or Opening Brief, fits squarely within the political question doctrine, we do not labor over the discrepancies.

declaratory judgment that "the state of National Emergency declared by Congressional Statute in 1933 still exists."  They also demanded declaratory judgments that "sub-par agricultural commodity prices shall be allowed as an affirmative defense in any action for debt" and that "the event of the commonly quoted U.S. dollar index . . . rising above 95 shall be allowed as an affirmative defense or as a basis for a stay of proceedings for foreclosure [against any individual, non-corporate U.S. farmer]."[6]

---

[6]In addition, Appellants sought "a declaratory judgment that parity pricing principles are the law of the land."  To support this claim, they rely on the Agricultural Adjustment Act ("AAA") of 1933.  The Senate Report from the Food, Agriculture, Conservation, and Trade Act of 1990, however, explains that

> the Supreme Court invalidated the production control provisions of the 1933 Act, [so] Congress passed a second Agricultural Adjustment Act in 1938. . . . The Agricultural Act of 1949 amended the 1938 Act to establish a permanent authority for parity-based price supports. However, since 1973, Congress has amended the 1949 Act regularly with legislation that expires after 4 or 5 years. Farm programs under these expiring authorities have become quite different from the parity-based programs of the 1930's and 1940's.

S. Rep. No. 101-357, at 43-45 (1990).  Thus, Appellants' reliance on the 1933 AAA is misplaced.  Furthermore, as the Senate Report explained, over the years Congress has enacted successive suspensions of the alleged parity pricing requirement.  Indeed, Appellants seem to acknowledge that the AAA of 1933 affords them no legal relief.  At various points in their briefs Appellants complain about how Congress has enacted "conflicting" legislation that has permitted the Executive Branch to "pursue[] other policies antithetical to parity pricing principles."

Last, they contended the federal government has effected a taking without paying just compensation in violation of the Fifth Amendment.

## DISCUSSION

A. The Political Question Doctrine

After reviewing Appellants' prayer for relief, we are convinced that the district court was correct to dismiss Appellants' claims as nonjusticiable political questions. Since it is a legal question, we review de novo the application of the political question doctrine. See Stuart v. United States, 813 F.2d 243, 246 (9th Cir. 1987), overruled on other grounds by United States v. Stuart, 489 U.S. 353 (1989).

Prudence, as well as separation-of-powers concerns, counsels courts to decline to hear "political questions." See Baker v. Carr, 369 U.S. 186, 210 (1962); Nixon v. United States, 506 U.S. 224, 252-53 (1993) (Souter, J., concurring in the judgment); Alexander M. Bickel, The Least Dangerous Branch 125-26, 184 (2d ed. 1986).[7] When deciding whether issues present political questions, courts must make a "discriminating inquiry into the precise facts and posture of the particular

_____

[7]To resolve this case we need not explore the underpinnings of the doctrine. We merely note that "it is uncertain whether the political question doctrine is constitutional, prudential, or both." Erwin Chemerinsky, Federal Jurisdiction §2.6, at 149 (3d ed. 1999).

case," for it resists "resolution by any semantic cataloguing." Baker, 369 U.S. at 217. As "there is no blanket rule," id. at 215, application of the doctrine must be made on a "case-by-case" basis, id. at 211.

The tangled roots of the political question doctrine stretch back to Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). See id. at 170 ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); see also generally id. at 164-66. The most thorough explication of the doctrine was provided in Baker v. Carr, in which the Supreme Court gathered the doctrine's "analytical threads." 369 U.S. at 211. It wrote, in this well-known passage,

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217.

We have no doubt that this case presents textbook examples of political questions and thus that it was properly dismissed by the district court. The Constitution commits to Congress the regulation of domestic and foreign

commerce, see U.S. Const. art. I, § 8, cl.3, the establishment of bankruptcy law, see id. cl.4, and the regulation of currency, see id. cl.5. To the President, the Constitution commits the "Power, by and with the Advice and Consent of the Senate, to make Treaties." U.S. Const. art. II, § 2, cl.2. "The Constitution confers a vast amount of power upon the political branches of the federal government in the area of foreign policy – particularly foreign commerce." Made in the USA Foundation v. United States, 242 F.3d 1300, 1313 (11th Cir. 2001) (gathering constitutional provisions and Supreme Court cases). The Supreme Court has recognized that "the President alone has the power to speak or listen as a representative of the nation. He makes treaties with the advice and consent of the Senate; but he alone negotiates." United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319 (1936). "While the treaty power of the Executive expressly involves the participation of the Legislature, nowhere does the Constitution contemplate the participation by the third, non-political branch, that is the Judiciary, in any fashion in the making of international agreements . . . ." Antolok v. United States, 873 F.2d 369, 381 (D.C. Cir. 1989) (opinion of Sentelle, J.). Besides this evidence of a textual commitment to the political branches of the regulation of domestic and foreign markets and currency, as well as the enactment of treaties and trade agreements, it is clear to us that Appellants' request that courts maintain market conditions, oversee trade agreements, and control currency

– all to the advantage of small farmers – would require courts to make "initial policy determinations" in an area devoid of "judicially discoverable and manageable standards" and where "multifarious pronouncements by various departments" would lead to confusion and disarray. As the Baker Court explained, "The political question doctrine [is] a tool for maintenance of governmental order," 369 U.S. at 215, and this case exemplifies when that tool should be employed. Courts are ill-equipped to make highly technical, complex, and on-going decisions regarding how to maintain market conditions, negotiate trade agreements, and control currency. The political branches, in contrast, retain just this sort of institutional competence. See Chicago & S. Air Lines v. Waterman S.S. Corp, 333 U.S. 103, 111 (1948) (explaining that foreign policy decisions "are delicate, complex, and involve large elements of prophecy. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."); see also Curtis A. Bradley, Chevron Deference and Foreign Affairs, 86 Va. L. Rev. 649, 659-60 (2000) (describing the political question doctrine in terms of the deference courts have chosen to afford to the Executive Branch).

When we turn to other aspects of Appellants' prayer for relief, e.g., a moratorium on farm foreclosures[8] and oversight of the Justice Department's enforcement of antitrust laws against agribusinesses,[9] we similarly find ourselves enmeshed in the Baker threads. Again, the Constitution commits to Congress the power to regulate domestic commerce and bankruptcies. See U.S. Const. art. I, § 8, cl.3 & cl.4. When and how banks may foreclose upon farms unquestionably falls within those powers, and nothing in existing bankruptcy law empowers us to act here. The Constitution requires the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and vests in the President the general "executive Power," id. § 1, cl.1. Thus, there is a textual commitment to the Executive Branch to enforce banking laws and to exercise prosecutorial discretion in bringing antitrust suits against agribusinesses. See United States v. Renfro, 620 F.2d 569, 574 (6th Cir. 1980) ("The decision of whether or not to prosecute . . . is a decision firmly committed by the constitution to the executive branch of the government. . . . [I]ntervention by the court in the internal affairs of the Justice Department would clearly constitute a violation of the Separation of Powers

---

[8]Presumably, this request for relief would have to be directed not against Appellees but against lending institutions holding mortgages on small farms. That group has not been named as a party.

[9]Similarly, Appellants did not name the Attorney General as a party.

Doctrine."); United States v. Am. Tel. & Tel. Co., 714 F.2d 178, 182 (D.C. Cir. 1983) (recognizing prosecutorial discretion).

Furthermore, Article III limits courts to adjudicating cases and controversies, thereby precluding the sort of judicial oversight of the political branches in which Appellants invite us to engage.  As the Supreme Court has observed,

> The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.  The Judiciary is particularly ill suited to make such decision, as courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.

Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986) (quotation marks omitted).

Likewise, turning to Appellants' request for a declaratory judgment that a 1933 national emergency still exists and that low farm prices or a strong dollar are affirmative defenses to actions to collect debt or to foreclose on farm property, Appellants in essence ask this court to re-formulate national policies because Appellants disagree with the policies instituted by the political branches. Indisputably, that is not the role of the Judiciary in our constitutional system.

Regarding the existence of another national emergency, in that case war, the Supreme Court has refused "to review the political departments'

- 13 -

determination of when or whether a war has ended. Dominant is the need for finality in the political determination, for emergency's nature demands 'A prompt and unhesitating obedience.'" Baker, 369 U.S. at 213 (quoting Martin v. Mott, 25 U.S. (12 Wheat) 19, 30 (1827) (calling up of militia)). As with war, the need for finality and certainty is critically important to determining whether a Depression-era national emergency has ended, for many social programs hinged, directly or indirectly, on that determination. Indeed, Appellants contend that they have legal rights because the 1933 national emergency remains on-going. Again, lack of legal standards and the necessity for the federal government to speak with one voice militate in favor of leaving such declarations to the political branches.

Appellants' request that we declare the existence of affirmative defenses to actions for debt or foreclosure is nothing but a plea for the courts to legislate. Clearly, the Constitution commits this power to Congress and the President. See INS v. Chadha, 462 U.S. 919, 945 (1983) ("Explicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the legislative process."). Appellants present us with no legal arguments as to why these affirmative defenses allegedly exist; they merely assert that the defenses should exist. Respect for the legislative process and separation of powers foreclose us from entertaining Appellants' suggestion. Deciding whether sound public policy recommends such affirmative defenses is

"an initial policy determination of a kind clearly for nonjudicial discretion." Baker, 369 U.S. at 217.

Appellants admit that "Executive Branch discretion would be invaded" if this court granted the relief they seek, but assert that it would be invaded "no further than appropriate[]." For the foregoing reasons, we disagree. Appellants ask us to invade inappropriately the provinces of both the Legislative and Executive Branches. This we decline to do.

B. Takings Claim

Appellants' takings claim fails. First, despite counsel's initial statement at oral argument that "this is a takings case," it is unclear whether Appellants properly presented this issue to this court on appeal. Appellants mentioned takings language in their Complaint, see Amended Complaint at 6, 25-26, but they discussed it only tangentially on appeal, failing either to cite takings cases or to develop any sort of argument. This is not sufficient to preserve the issue for appeal. See Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1314 n.4 (10th Cir. 1998) ("[D]iscussing a theory only in a vague and ambiguous way below is not adequate to preserve issues for appeal.").

Buttressing our conclusion that Appellants failed to present a takings claim to the district court are Appellants' repeated assertions that "[they] seek no

monetary damages . . . but, rather, seek only declaratory and injunctive relief."

Opening Brief at 1; see also Amended Complaint at 4 ("[T]he relief requested is

purely declaratory or injunctive."). Generally, the remedy for a governmental

taking is just compensation. See U.S. Const. amend. V. Moreover, the district

court's order makes no reference to such a claim. This court "should not be

considered 'a second-shot' forum . . . where secondary, back-up theories may be

mounted for the first time." Tele-Communications, Inc. v. Comm'r, 104 F.3d

1229, 1233 (10th Cir. 1997).

Even if Appellants properly preserved a takings claim, that claim fails as

premature. "[T]aking claims against the Federal Government are premature until

the property owner has availed itself of the process provided by the Tucker Act."

Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195

(1985). Furthermore, Appellants brought their takings claim in the wrong court:

"The Tucker Act provides jurisdiction in the United States Claims Court for any

claim against the Federal Government to recover damages founded on the

Constitution, a statute, a regulation, or an express or implied-in-fact contract."

Preseault v. I.C.C., 494 U.S. 1, 11-12 (1990) (citing 28 U.S.C. § 1491(a)(1)).

Appellants do not allege that they sought and were denied just compensation after

bringing a Tucker Act claim in the United States Court of Claims. These facts

- 16 -

support our conclusion that Appellants did not initially intend to make a takings claim, but later decided to elevate that claim to a more central position on appeal.

Finally, were we to address Appellants' takings claim, we would find it time-barred. Appellants argue, "It is undisputed that agricultural property rights were subjected to a taking for public use on May 12, 1933." The general statute of limitations period for actions against the United States is six years. See 28 U.S.C. § 2401.

Consequently, we find that Appellants' takings claim fails.

## CONCLUSION

We AFFIRM the dismissal of Appellants' complaint.