FILED
United States Court of Appeals
Tenth Circuit

March 7, 2014

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

ANDY KERR, Colorado State
Representative; NORMA V.
ANDERSON; JANE M. BARNES,
member Jefferson County Board of
Education; ELAINE GANTZ BERMAN,
member State Board of Education;
ALEXANDER E. BRACKEN;
WILLIAM K. BREGAR, member Pueblo
District 70 Board of Education; BOB
BRIGGS, Westminster City Councilman;
BRUCE W. BRODERIUS, member Weld
County District 6 Board of Education;
TRUDY B. BROWN; JOHN C.
BUECHNER, Ph.D., Lafayette City
Councilman; STEPHEN A.
BURKHOLDER; RICHARD L. BYYNY,
M.D.; LOIS COURT, Colorado State
Representative; THERESA L. CRATER;
ROBIN CROSSAN, member Steamboat
Springs RE-2 Board of Education;
RICHARD E. FERDINANDSEN;
STEPHANIE GARCIA, member Pueblo
City Board of Education; KRISTI
HARGROVE; DICKEY LEE
HULLINGHORST, Colorado State
Representative; NANCY JACKSON,
Arapahoe County Commissioner;
WILLIAM G. KAUFMAN; CLAIRE
LEVY, Colorado State Representative;
MARGARET (MOLLY) MARKERT,
Aurora City Councilwoman; MEGAN J.
MASTEN; MICHAEL MERRIFIELD;

No. 12-1445

MARCELLA (MARCIE) L.
MORRISON; JOHN P. MORSE,
Colorado State Senator; PAT NOONAN;
BEN PEARLMAN, Boulder County
Commissioner; WALLACE PULLIAM;
PAUL WEISSMANN; JOSEPH W.
WHITE,

     Plaintiffs - Appellees,

v.

JOHN HICKENLOOPER, Governor of
Colorado, in his official capacity,

     Defendant - Appellant.

------------------------------

D'ARCY W. STRAUB;
INDEPENDENCE INSTITUTE; CATO
INSTITUTE; SEN. KEVIN
LUNDBERG; REP. JERRY
SONNENBERG; REP. JUSTIN
EVERETT; REP. SPENCER SWALM;
REP. JANAK JOSHI; REP. PERRY
BUCK; SEN. TED HARVEY; SEN.
KENT LAMBERT; SEN. MARK
SCHEFFEL; SEN. KEVIN
GRANTHAM; SEN VICKI MARBLE;
SEN. RANDY BAUMGARDNER; REP.
DAN NORDBERG; REP. FRANK
MCNULTY; REP. JARED WRIGHT;
REP. CHRIS HOLBERT; REP. KEVIN
PRIOLA; SEN. SCOTT RENFROE;
SEN. BILL CADMAN; COLORADO
UNION OF TAXPAYERS
FOUNDATION; NATIONAL
FEDERATION OF INDEPENDENT
BUSINESS; TABOR FOUNDATION;
OKLAHOMA COUNCIL FOR PUBLIC

- 2 -

AFFAIRS; HOWARD JARVIES TAXPAYERS FOUNDATION; FREEDOM CENTER OF MISSOURI; FREEDOM FOUNDATION; GOLDWATER INSTITUTE; 1851 CENTER FOR CONSTITUTIONAL LAW; COLORADO CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS AND COLORADO NONPROFIT ASSOCIATION; COLORADO GENERAL ASSEMBLY; BELL POLICY CENTER; COLORADO FISCAL INSTITUTE; THE CENTER ON BUDGET AND POLICY PRIORITIES; COLORADO PARENT TEACHER ASSOCIATION; ERWIN CHEMERINSKY; HANS LINDE; WILLIAM MARSHALL; GENE NICHOL; WILLIAM WIECEK; COLORADO ASSOCIATION OF SCHOOL BOARDS; COLORADO ASSOCIATION OF SCHOOL EXECUTIVES,

  Amici Curiae.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CV-01350-WJM-BNB)**

---

Daniel D. Domenico, Solicitor General (John W. Suthers, Attorney General, Frederick R. Yarger, Assistant Solicitor General, Bernie Buescher, Deputy Attorney General, Megan Paris Rundlet, Assistant Attorney General, with him on the briefs), Office of the Attorney General for the State of Colorado, Denver, Colorado, for the Defendant-Appellant.

David E. Skaggs (Lino S. Lipinsky de Orlov, Herbert Lawrence Fenster, McKenna Long & Aldridge LLP; Michael F. Feeley, John A. Herrick, Geoffrey M. Williamson, and Carrie E. Johnson, Brownstein Hyatt Farber Schreck LLP, with him on the briefs), Denver, Colorado for the Plaintiffs-Appellees.

Richard A. Westfall, Hale Westfall, LLP, Denver, Colorado and Karen R. Harned and Luke A. Wake, NFIB Small Business Legal Center, Washington, DC, filed an amicus curiae brief for National Federal of Independent Business, Tabor Foundation, Oklahoma Council for Public Affairs, Howard Jarvies Taxpayers Foundation, Freedom Center of Missouri, 1851 Center for Constitutional Law, Freedom Foundation, and Goldwater Institute on behalf of Defendant-Appellant.

David B. Kopel, Independence Institute, Denver, Colorado, and Ilya Shapiro, Cato Institute, Washington, DC, filed an amicus curiae brief for Independence Institute and Cato Institute on behalf of Defendant-Appellant.

James M. Manley, Mountain States Legal Foundation, Lakewood, Colorado, filed an amicus curiae brief for Sen. Kevin Lundberg, Rep. Jerry Sonnenberg, Rep. Justin Everett, Rep. Spencer Swalm, Rep. Janak Joshi, Rep. Perry Buck, Sen. Ted Harvey, Sen. Kent Lambert, Sen. Mark Scheffel, Sen. Kevin Grantham, Sen. Vicki Marble, Sen. Randy Baumgardner, Rep. Dan Nordberg, Rep. Frank McNulty, Rep. Jared Wright, Rep. Chris Holbert, Rep. Kevin Priola, Sen. Scott Renfroe, Sen. Bill Cadman, and Colorado Union of Taxpayers Foundation on behalf of Defendant-Appellant.

D'Arcy W. Straub, Littleton, Colorado, filed an amicus curiae brief for D'arcy W. Straub, on behalf of Defendant-Appellant.

Andrew M. Low, Emily L. Droll, and John M. Bowlin, Davis Graham & Stubbs LLP, Denver, Colorado, filed an amicus curiae brief for Colorado Association of School Boards and Colorado Association of School Executives on behalf of Plaintiffs-Appellees.

Melissa Hart, University of Colorado Law School, Boulder, Colorado, filed an amicus curiae brief for Erwin Chemerinsky, Hans Linde, William Marshall, Gene Nichol, and William Wiecek on behalf of Plaintiffs-Appellees.

Joseph R. Guerra and Kathleen Mueller, Sidley Austin LLP, Washington, DC, filed an amicus curiae brief for The Center on Budget and Policy Priorities on behalf of Plaintiffs-Appellees.

Stephen G. Masciocchi, Holland & Hart, Denver, Colorado, and Maureen Reidy Witt, Holland & Hart, Greenwood Village, Colorado, filed an amicus curiae brief for The Colorado General Assembly on behalf of Plaintiffs-Appellees.

Matthew J. Douglas, Holly E. Sterrett, Paul W. Rodney, and Nathaniel J. Hake, Arnold & Porter LLP, Denver, Colorado, filed an amicus curiae brief for the Bell Policy Center and the Colorado Fiscal Institute on behalf of Plaintiffs-Appellees.

Catherine C. Engberg, Shute, Mihaly & Weinberger LLP, San Franscisco, California, filed an amicus curiae brief for Colorado Parent Teacher Association on behalf of Plaintiffs-Appellees.

Harold A. Haddon and Laura G. Kastetter, Haddon, Morgan and Foreman, P.C., Denver, Colorado, filed an amicus curiae brief for Colorado Chapter of the American Academy of Pediatrics and Colorado Nonprofit Association on behalf of Plaintiffs-Appellees.

Before **BRISCOE**, Chief Judge, **SEYMOUR** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

Article IV, § 4 of the Constitution of the United States of America guarantees to the State of Colorado a "Republican Form of Government."  It provides:  "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."  U.S. Const. art. IV, § 4.  This right to a republican form of government is further assured and mandated by the enabling act of Congress, Colorado Enabling Act, ch. 139, § 4, 18 Stat. 474, 474 (1875), under which the State was admitted to the Union in 1876.

Various groups, and in particular, several Colorado state legislators, brought an action in the U.S. District Court for the District of Colorado.  They claim that the so-called Taxpayer's Bill of Rights, TABOR, violates the Guarantee Clause of the federal

Constitution, is in direct conflict with provisions of the Enabling Act, and impermissibly amends the Colorado Constitution.

In order to avoid Eleventh Amendment sovereignty issues, the Governor of Colorado, John Hickenlooper, was designated as the named defendant. Governor Hickenlooper filed his Answer to the plaintiffs' Complaint, and promptly followed with a motion to dismiss, alleging that plaintiffs lacked Article III standing and prudential standing, and that their claims were barred by the political question doctrine. This motion was denied by the district court, and the Governor brings this appeal to us, asserting error and asking us to dismiss the proceedings on the same bases that he presented to the district court.

The merits of the case are not before us. We express no view on the substantive issues and intend none. We consider solely standing and the political question doctrine: whether these plaintiffs have suffered a particularized injury not widely shared by the general populace that entitles them to have their case heard by the federal courts, and whether the question presented is purely political in nature and should not be reached by the courts. We conclude that these plaintiffs may bring their claims and that the political question doctrine does not bar our consideration. Exercising jurisdiction under 28 U.S.C. § 1292(b), we affirm the district court's ruling and remand for further proceedings.

**I**

Article X, § 20 of the Colorado Constitution—better known as the Taxpayer's Bill

of Rights or TABOR—was adopted by voter initiative in 1992.[1]  TABOR limits the revenue-raising power of the state and local governments by requiring "voter approval in advance for . . . any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a new tax revenue gain."  Colo. Const. art. X, § 20, cl. 4(a).  TABOR also limits state year-to-year spending increases to "inflation plus the percentage change in state population in the prior calendar year," id. cl. 7(a), requires that revenue exceeding this limit "be refunded in the next fiscal year unless voters approve a revenue change," id. cl. 7(d), and bans any "new state real property tax or local district income tax," id. cl. 8(a).  Like all provisions in Colorado's Constitution, TABOR may be revoked or amended only with voter approval.  Id. art. XIX, § 2 ("[A]mendments shall be submitted to the registered electors of the state for their approval or rejection, and such as are approved by a majority of those voting thereon shall become part of this constitution."); id. § 1 (requiring voter approval to call constitutional convention).

More than thirty citizens of Colorado—including educators, parents of school-age children, and current and former state legislators—brought this suit against Colorado Governor John Hickenlooper in May 2011.  The Second Amended Substitute Complaint

---

[1] Like the district court, we take judicial notice of the provisions of the Colorado Constitution at issue in this case.  See Fed. R. Evid. 201(b).

- 7 -

for Injunctive and Declaratory Relief (the "complaint")[2] alleges that TABOR "undermines the fundamental nature of the state's Republican Form of Government" in violation of the Guarantee Clause, U.S. Const. art. IV, § 4. The complaint further alleges that TABOR violates the Colorado Enabling Act, the Supremacy Clause, and the Equal Protection Clause of the Fourteenth Amendment, and that it constitutes an impermissible amendment to the state constitution under state constitutional law principles.

Governor Hickenlooper moved to dismiss the complaint. He argued that plaintiffs lacked standing and that the political question doctrine required dismissal of all claims. The Governor also argued that the plaintiffs failed to state a claim on which relief could be granted as to their equal protection and impermissible amendment claims. The district court concluded that the plaintiffs who were current state legislators possessed standing and declined to assess the standing of the remaining plaintiffs. It ruled that the political question doctrine did not bar the lawsuit, thereby allowing plaintiffs to proceed on their Guarantee Clause and Enabling Act challenges to TABOR. The district court dismissed

_____

[2] The complaint in this case has gone through several iterations. Plaintiffs originally intended to sue the state of Colorado, but following preliminary discussions with attorneys in the Office of the Colorado Attorney General, both sides agreed that Governor Hickenlooper should be named as the defendant in order to avoid possible Eleventh Amendment issues. Thus, on June 16, 2011, plaintiffs filed what they styled a "Substituted Complaint for Injunctive and Declaratory Relief." The district court later granted several motions to amend. Plaintiffs' Second Amended Substitute Complaint for Injunctive and Declaratory Relief is the operative complaint in this action. All references and citations to the complaint herein refer to that document. See S. Utah Wilderness Alliance v. Palma, 707 F.3d 1143, 1152 (10th Cir. 2013) ("Where . . . the original complaint has been super[s]eded by an amended complaint, we examine the amended complaint in assessing a plaintiff's claims . . . ." (quotation omitted)).

the equal protection challenge for failure to state a claim but refused to dismiss the impermissible amendment claim, exercising supplemental jurisdiction under 28 U.S.C. § 1367(a).

Governor Hickenlooper then asked the district court to certify its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court granted his request for certification and stayed the proceedings. A previous panel of this court granted permission to appeal. See 28 U.S.C. § 1292(b) ("The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order [certified for interlocutory appeal].").

## II

We review de novo the district court's rulings on standing. Petrella v. Brownback, 697 F.3d 1285, 1292 (10th Cir. 2012). The plaintiffs bear the burden of establishing each element of standing. Id. In determining whether plaintiffs have met their burden, we assume the allegations contained in the complaint are true and view them in the light most favorable to the plaintiffs. S. Utah Wilderness Alliance, 707 F.3d at 1152. To establish Article III standing, a plaintiff must show: (1) that it has suffered a concrete and particular injury in fact that is either actual or imminent; (2) the injury is fairly traceable to the alleged actions of the defendant; and (3) the injury will likely be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The district court determined that the plaintiffs who are current state legislators

(the "legislator-plaintiffs") have standing and thus declined to assess the standing of any of the other named plaintiffs. See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9 (1977) (allowing suit to proceed based on "one individual plaintiff who has demonstrated standing" without considering standing of remaining plaintiffs); see also Massachusetts v. Envtl. Prot. Agency, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). We similarly limit our review to the standing of the legislator-plaintiffs.

## A

Our analysis of standing begins with injury-in-fact. The legislator-plaintiffs claim that TABOR deprives them of their ability to perform the "legislative core functions of taxation and appropriation." They say that TABOR prevents them from doing their jobs. Several cases have held, in other contexts, that an inhibition on a person's ability to perform work constitutes an injury-in-fact. See Singleton v. Wulff, 428 U.S. 106, 112-13 (1976) (allowing physicians who perform abortions to challenge law restricting Medicaid reimbursement); Ezell v. City of Chicago, 651 F.3d 684, 696 (7th Cir. 2011) (concluding "supplier of firing-range facilities" possessed standing to challenge city's ban on such facilities); Sammon v. N.J. Bd. of Med. Exam'rs, 66 F.3d 639, 642 (3d Cir. 1995) (aspiring midwives had standing to challenge statutory scheme that made "it more difficult for [them] to practice their chosen profession"); see also Pierce v. Soc'y of Sisters, 268 U.S. 510, 532, 535-36 (1925) (overturning state law mandating public education characterized by plaintiffs as conflicting "with right of

- 10 -

schools and teachers . . . to engage in a useful business or profession"). However, standing in these cases was based in part on the harm, either financial or penal, that plaintiffs would suffer as a result of legislation inhibiting their ability to work. TABOR does not inflict either type of injury upon Colorado legislators. See Colo. Const. art. V, § 6 (fixing salary of members of the General Assembly); id. § 16 (providing legislative immunity to members).

Nonetheless, the Supreme Court has held that members of a state legislature may have standing to sue in order to vindicate the "plain, direct and adequate interest in maintaining the effectiveness of their votes." Coleman v. Miller, 307 U.S. 433, 438 (1939). We therefore consider the legislator-plaintiffs' claimed injury under the Supreme Court's legislative standing framework, first articulated in Coleman and later refined by Raines v. Byrd, 521 U.S. 811 (1997).

Coleman involved a challenge by state legislators to Kansas' ratification of a proposed federal constitutional amendment. 307 U.S. at 435. Twenty senators voted in favor of the proposed amendment, and twenty voted against. Id. at 436. The Lieutenant Governor, presiding over the state Senate, broke the tie in favor of ratification, and the state House of Representatives later approved the amendment. Id. Twenty-one senators, including the twenty who had opposed the amendment, sought a writ of mandamus in state court. Id. After the state court denied mandamus relief, the Supreme Court granted certiorari. Id. at 437.

The Court held that the legislators had standing to sue:

- 11 -

> [P]laintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes. Petitioners come directly within the provisions of the statute governing our appellate jurisdiction. They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege.

Id. at 438. It reasoned perforce from two cases in which ordinary voters were permitted to challenge state ratifications of federal constitutional amendments. Id. at 438-39 (citing Leser v. Garnett, 258 U.S. 130 (1922) (entertaining citizen challenge to registration of female voters) and Hawke v. Smith, 253 U.S. 221 (1920) (entertaining citizen challenge to Ohio constitutional amendment requiring voter approval of federal constitutional amendments)).

In Raines, the Supreme Court declined to extend Coleman. Raines dealt with a challenge to the Line Item Veto Act ("LIVA") brought by six Members of Congress who had voted against it. 521 U.S. at 814. Holding that its "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," id. at 819-20, it distinguished an earlier suit in which a legislator had successfully asserted standing to challenge his exclusion from Congress. Id. at 820-21 (citing Powell v. McCormack, 395 U.S. 486 (1969)). Plaintiffs in Raines were not "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies," 521 U.S. at 821, and they failed to allege deprivation of something to

- 12 -

which they were "personally . . . entitled." Id. (emphasis omitted).

Raines also distinguished Coleman, concluding that

Coleman stands []at most . . . for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.

521 U.S. at 823 (footnote omitted).  It ultimately ruled that the Raines plaintiffs lacked

standing.  "[T]heir votes [against LIVA] were given full effect," the Court stated; "[t]hey

simply lost that vote."  Id. at 824 (footnote omitted).  The Supreme Court characterized

the Raines plaintiffs' alleged injury as "the abstract dilution of institutional legislative

power."  Id. at 826.

It emphasized that the plaintiffs in that case used the word "effectiveness"

(describing their vote for appropriations bills) in a way that "pulls Coleman too far from

its moorings" and "stretches the word far beyond the sense in which the Coleman opinion

used it."  Raines, 521 U.S. at 825-26.

The argument goes as follows.  Before [LIVA], Members of Congress could be sure that when they voted for, and Congress passed, an appropriations bill that included funds for Project X, one of two things would happen:  (i) the bill would become law and all of the projects listed in the bill would go into effect, or (ii) the bill would not become law and none of the projects listed in the bill would go into effect.  Either way, a vote for the appropriations bill meant a vote for a package of projects that were inextricably linked.  After [LIVA], however, a vote for an appropriations bill that includes Project X means something different. Now, in addition to the two possibilities listed above, there is a third option: the bill will become law and then the President will "cancel" Project X.

Id. at 825 (footnote omitted).  LIVA could not possibly "nullify [plaintiffs'] votes in the

- 13 -

future in the same way that the votes of the <u>Coleman</u> legislators had been nullified" because "a majority of Senators and Congressman can vote to repeal [LIVA], or to exempt a given appropriations bill (or a given provision in an appropriations bill) from [LIVA]." <u>Id.</u> at 824.

Neither <u>Coleman</u> nor <u>Raines</u> maps perfectly onto the alleged injury in this case. Unlike those in <u>Raines</u>, the allegations before us go well beyond mere "abstract dilution." Plaintiffs claim that they have been deprived of their power over taxation and revenue. Under TABOR, the state "must have voter approval in advance for . . . any new tax, tax rate increase, . . . or a tax policy change directly causing a net tax revenue gain to any district," with narrow exceptions.[3] Colo. Const. art. X, § 20, cl. 4(a). With respect to taxing and revenue, which the plaintiffs describe as "legislative core functions," the General Assembly allegedly operates not as a legislature but as an advisory body, empowered only to recommend changes in the law to the electorate.

These allegations fall closer to the theory of vote nullification espoused in <u>Coleman</u> than to the abstract dilution theory rejected in <u>Raines</u>. Under TABOR, a vote for a tax increase is completely ineffective because the end result of a successful

---

[3] The exceptions permit "emergency taxes" when two-thirds of the legislature "declares the emergency and imposes the tax by separate recorded roll call votes," Colo. Const. art. X, § 20, cl. 6, and permit the suspension of the prior approval requirement "[w]hen annual district revenue is less than annual payments on general obligation bonds, pensions, and final court judgments," <u>id.</u> cl. 1. None of the parties suggests these exceptions alter our analysis.

- 14 -

legislative vote in favor of a tax increase is not a change in the law.[4]  A vote that is advisory from the moment it is cast, regardless of how other legislators vote, is "ineffective" in a way no vote envisioned by LIVA could be.

Moreover, the case at bar does not share other characteristics highlighted by the Raines Court.  Unlike LIVA, TABOR was not passed by, and cannot be repealed by, the Colorado General Assembly.  See Raines, 521 U.S. at 824; Colo. Const. art. XIX (requiring voters to approve constitutional amendments or the calling of a constitutional convention).  In Schaffer v. Clinton, 240 F.3d 878 (10th Cir. 2001), we concluded that a Congressman lacked standing to challenge a Congressional pay increase, noting that "as in Raines, there has been no nullification of Congressman Schaffer's ability to vote."  Id. at 885-86.  His pay was increased "simply because he lost [a] vote," and to the extent he found the pay increase objectionable, the Congressman was free "to press for a change in the law setting Representatives' salaries or for Congress to amend the COLA provisions pursuant to the normal legislative process."  Id. at 886 (quotation omitted).  In sharp contrast, TABOR denies the Colorado General Assembly the "ability to vote" on operative tax increases, and the legislator-plaintiffs cannot undo its provisions "pursuant to the normal legislative process."  Id. at 885-86.

---

[4] The governor may veto the result of a successful legislative vote in Colorado, but the result of a veto is not analogous to what TABOR requires.  Colo. Const. art. IV, § 11. When the governor vetoes a bill, it does not become law but is returned to the legislature, which may override the veto by a two-thirds vote.  Id.  Votes subject to a veto are not advisory from the moment that they are cast in the same way as votes requiring "voter approval in advance," id. art. X, § 20, cl. 4, before a law is enacted.

- 15 -

Several other courts have relied on this key distinction between <u>Coleman</u> and <u>Raines</u>. In <u>Russell v. DeJongh</u>, 491 F.3d 130 (3d Cir. 2007), the Third Circuit considered whether a member of the Legislature of the Virgin Islands possessed standing to assert a claim that the governor had improperly appointed justices to the Supreme Court of the Virgin Islands. <u>Id.</u> at 131. Claiming that the expiration of a statutory ninety-day deadline extinguished the governor's authority to submit nominations, and that the governor's decision to ignore the deadline nullified his vote in favor of the law creating the deadline, the plaintiff sought a declaration that the nominations were void. <u>Id.</u> at 133-34. The court explained that "legislators have a legally protected interest in their right to vote on legislation and other matters committed to the legislature, which is sometimes phrased as an interest in 'maintaining the effectiveness of their votes.'" <u>Id.</u> at 134 (quoting <u>Coleman</u>, 307 U.S. at 438). However, "[n]ot every affront to a legislator's interest in the effectiveness of his vote . . . is an injury in fact sufficient to confer standing." <u>Id.</u> Although courts have "h[e]ld uniformly that an official's mere disobedience or flawed execution of a law for which a legislator voted . . . is not an injury in fact," the <u>Russell</u> court noted that "distortion of the process by which a bill becomes law by nullifying a legislator's vote or depriving a legislator of an opportunity to vote . . . is an injury in fact." <u>Id.</u> at 135 (quotation omitted). It rejected the plaintiff's reliance on <u>Coleman</u> and another case, <u>Silver v. Pataki</u>, 755 N.E.2d 842 (N.Y. 2001) (per curiam), because "the challenged actions in those cases left the plaintiffs with no effective remedies in the political process." <u>Russell</u>, 491 F.3d at 135 (footnote omitted). In announcing that

- 16 -

Russell was not a "vote nullification" case, the Third Circuit explained that "[t]he consequence of the Governor's late submission of the nominations was . . . not to circumvent the Legislature, but to place the decision whether to confirm the nominees directly in their hands." Id. at 136. In the case at bar, the power to tax and spend is not directly in the hands of the Colorado legislature.

The New York Court of Appeals drew a similar line in Silver, which dealt with a challenge by the Speaker of the New York Assembly to the Governor's line item veto authority on non-appropriation bills.[5] 755 N.E.2d at 845. Considering both state and federal cases on legislative standing, the court distinguished between alleged injuries related to "lost political battles" and those concerning "nullification of votes."[6] Id. at 847. The Court characterized Coleman as involving vote nullification, and Raines as a "lost vote" case. Id. It concluded that the plaintiff possessed standing in part because he was "not seeking to obtain a result in a courtroom which he failed to gain in the halls of the Legislature." Id. at 848 (quotation omitted). In contrast, the court explained that the Raines plaintiffs "lost their political battles when legislation was validly enacted over their opposition." Id. We are not confronted with claimants who complain of nothing

---

[5] The New York State Constitution provides for line-item vetoes with respect to bills that "contain several items of appropriation of money." N.Y. Const. art. IV, § 7.

[6] Although we recognize the Court of Appeals of New York is not bound by Article III, the Silver decision applies the injury-in-fact test in terms essentially identical to the federal requirement. Id. at 847, 848 (requiring an "injury in fact" that is "concrete and particularized" (quotations omitted)). We cite Silver for its persuasive interpretation of Coleman and Raines.

more than a lack of success within the legislature; plaintiffs' complaint alleges that TABOR has stripped the legislature of its rightful power.

Baird v. Norton, 266 F.3d 408 (6th Cir. 2001), illustrates the difference between legislators who allege unconstitutional state action and legislators who merely seek to reverse the results of a lost vote. In Baird, two state legislators who were on the losing side of a concurrent resolution approving gaming compacts complained that the approval was improper. Id. at 409-10. Unlike the action in Coleman, the court observed, the suit was not joined by a sufficient number of legislators to defeat the concurrent resolution and thus the plaintiffs lacked standing. Id. at 412. The rule from Raines applied because the plaintiffs were not arguing "that the compacts themselves [were] unconstitutional" but instead alleged that "the compacts would have been defeated[] had the constitutionally required procedures been followed." Id. at 413. Baird therefore stands for the proposition that legislators seeking standing arising from a lost vote must demonstrate that they would have won had proper procedures been followed. Allegations before us go beyond those in Baird; the plaintiff-legislators in this case challenge a provision that, they allege, deprives them of the ability to cast meaningful votes at all.

Other circuits, the D.C. Circuit in particular, have interpreted Raines in a similar manner. In Campbell v. Clinton, 203 F.3d 19 (D.C. Cir. 2000), the court held that a number of congressmen lacked standing to challenge U.S. participation in the NATO campaign in Yugoslavia. Id. at 19. It wrote that Supreme Court precedent cannot be read to suggest "that the President 'nullifies' a congressional vote and thus legislators have

standing whenever the government does something Congress voted against." Id. at 22. The majority concluded that Judge Randolph, who concurred in the judgment and wrote separately, did "not give sufficient attention to Raines' focus on the political self-help available to congressmen. . . . [T]he [Raines] Court denied them standing as congressmen because they possessed political tools with which to remedy their purported injury." Id. at 24; see also Chenoweth v. Clinton, 181 F.3d 112, 116 (D.C. Cir. 1999) (concluding House members lacked standing to challenge the President's implementation of a program through executive order, in part because "[i]t is uncontested that the Congress could terminate the [program] were a sufficient number in each House so inclined"); Kucinich v. Obama, 821 F. Supp. 2d 110, 120 (D.D.C. 2011) (successful use of vote nullification theory "necessitates the absence of a legislative remedy"). We agree with these cases that Raines rested in large measure on the plaintiffs' ability to correct the alleged injury through ordinary legislation, an ability the legislator-plaintiffs in this case lack. A legislator who complains of nothing more than dissatisfaction with the actions, or inaction, of his colleagues does not state an injury to a judicially cognizable interest.

Furthermore, because the present suit deals with the relationship between a state legislature and its citizenry, we are not presented with the separation-of-powers concerns that were present in Raines. See 521 U.S. at 819-20 ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."). The Raines decision has been characterized as "standing informed—

- 19 -

and indeed virtually controlled—by political-question concerns."  13B Charles Alan Wright et al., Federal Practice & Procedure, § 3531.11.2, at 135 (3d ed. 2008).  In Tachiona v. United States, 386 F.3d 205 (2d Cir. 2004), the Second Circuit similarly concluded that Raines was "distinguishable in crucial respects" because it did not "involve[] a constitutional challenge to an action taken by one of the other two branches of the Federal Government—a fact that the Court believed merited an 'especially rigorous' standing inquiry."  Id. at 213 (quoting Raines, 521 U.S. at 819-20); see also Chenoweth, 181 F.3d at 116 (stating that Raines may "require [the court] to merge [its] separation of powers and standing analyses").

Notably, the Colorado General Assembly, through its Committee on Legal Services, has chosen to participate as an amicus curiae in favor of legislative standing in this appeal.[7]  The General Assembly's  participation further distinguishes this case from Raines, in which the Court "attach[ed] some importance to the fact that appellees ha[d] not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose[d] their suit."  521 U.S. at 829.

The legislator-plaintiffs' allegations in the case before us differ in some respects from those at issue in Coleman.  Nevertheless, we must reject Governor Hickenlooper's argument that plaintiffs' failure to identify a "specific legislative act" that TABOR has

---

[7] The General Assembly's amicus brief does not imply "authorization" of the legislator-plaintiffs.

precluded is fatal to their claim. See Raines, 521 U.S. at 823. He argues that the legislator-plaintiffs must refer a tax increase to the voters, and have that measure rejected, before they bring suit.[8] This argument misunderstands the alleged injury. Legislator-plaintiffs contend they have been injured because they are denied the authority to legislate with respect to tax and spending increases.[9] They cannot point to a specific act that would have resulted in a tax increase because any revenue-raising bill passed by both houses of the General Assembly and signed by the governor, instead of becoming law,

[8] Both parties have provided supplemental authority to this court noting that Colorado voters recently approved "Proposition AA," which imposes a new tax on marijuana and was referred for a referendum, but rejected "Amendment 66," a citizen initiative that would have raised taxes to fund certain public school reforms. However, "standing is determined at the time the action is brought, and we generally look to when the complaint was first filed, not to subsequent events." Mink v. Suthers, 482 F.3d 1244, 1253-54 (10th Cir. 2007) (citation omitted). We accordingly do not consider these November 2013 events.

[9] We recognize that legislatures may permissibly be deprived of authority to legislate in certain arenas. The First Amendment, to take an obvious example, says that "Congress shall make no law" in a variety of fields. U.S. Const. amend. I. We distinguish the sorts of substantive prohibitions found in the Bill of Rights and elsewhere—"Congress shall make no law" means "there shall be no federal law"—from TABOR's alleged transformation of the state legislature from a body that makes laws to a body that recommends to the public laws increasing taxes or spending. So construed, the injury allegedly caused by TABOR is unique and unlikely to cause the federal courts to be flooded with legislators on the losing side of a vote. We are aware of a few Supreme Court cases involving requirements of municipal referenda before a decision made by a city council could go into effect. See City of Eastlake v. Forest City Enters., Inc., 426 U.S. 668, 670 (1976) (changes in land use required 55% citizen approval in referendum); James v. Valtierra, 402 U.S. 137, 139, 142 (1971) (construction of low-cost housing could not occur without voter referendum, noting other referenda requirements in California Constitution). In neither case was standing a contested issue, nor did any plaintiff rest a claim on the Guarantee Clause.

- 21 -

would merely be placed on the ballot at the next election. In other words, the legislator-plaintiffs' injury is their disempowerment rather than the failure of any specific tax increase.

The extent and type of disempowerment distinguishes the case before us from Alaska Legislative Council v. Babbitt, 181 F.3d 1333 (D.C. Cir. 1999). In that case, the D.C. Circuit concluded that members of the Alaska State Legislature and a legislative committee lacked standing to challenge a federal statute that established a priority for subsistence hunting and fishing on federal lands in the state. Id. at 1335-36. Plaintiffs' theory that the federal statute "render[ed] the Alaska Legislature unable to control hunting and fishing on federal lands within the State" was rejected because "there is not the slightest suggestion here that these particular legislators had the votes to enact a particular measure, that they cast those votes or that the federal statute or the federal defendants did something to nullify their votes." Id. at 1338. The court expressed skepticism that the federal statute undermined state prerogatives, noting that federal regulations promulgated pursuant to the challenged statute expressly incorporated state game and fishing rules. Id. Much like the plaintiffs in Raines, the Alaska legislators therefore retained some legislative control and were not without a legislative remedy.

This led the D.C. Circuit to conclude that the "supposed injury is nothing more than an abstract dilution of institutional legislative power to regulate and manage fish and wildlife resources, and we are not sure it amounts to even this much." Id. (quotation omitted). The state legislators in Alaska Legislative Council complained only that they

- 22 -

lost some control over federal lands, a power the Constitution expressly grants to Congress. See U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."). By contrast, the state legislators before us have alleged that TABOR strips them of all power to conduct a "legislative core function" that is not constitutionally committed to another legislative body.

In light of the actual injury alleged, Governor Hickenlooper's "specific legislative act" argument does not carry the day. TABOR plainly bars the General Assembly from instituting a new tax through legislative action. Our standing jurisprudence does not demand that plaintiffs engage in an obviously futile gesture. In United States v. Hardman, 297 F.3d 1116 (10th Cir. 2002) (en banc), we considered a challenge to 16 U.S.C. §§ 703 and 668(a), which prohibit possession of certain eagle feathers absent a permit. Hardman, 297 F.3d at 1122-23. Only members of federally recognized tribes were eligible for such permits. Id. at 1121. We rejected the government's argument that the non-member claimants in the case lacked standing because they had not applied for permits, noting that "the application itself requires certification of membership." Id. "Because it would have been futile for these individuals to apply for permits, we find that they have standing to challenge the statutory and regulatory scheme." Id. A similar principle applies here: The legislator-plaintiffs were not required to pass a law purporting to independently increase taxes in violation of TABOR before filing this action.

- 23 -

That both <u>Coleman</u> and <u>Raines</u> involved allegations concerning a single vote does not imply that only single-vote matters may give rise to an injury in fact. If plaintiffs seek legislative standing based on the nullification of a particular vote, <u>Raines</u> requires that they identify "a specific legislative act . . . [that] goes into effect (or does not go into effect)" as a result. 521 U.S. at 823; <u>see also</u> <u>Baird</u>, 266 F.3d at 412. But we do not read <u>Raines</u> to require legislators seeking standing to plead facts substantially identical to <u>Coleman</u>'s. Were that the case, the discussion of various other elements militating against legislative standing in <u>Raines</u> would be dicta. <u>See</u> 521 U.S. at 819-20, 825-26. And it would be a bizarre result if the nullification of a single vote supported legislative standing, but the nullification of a legislator's authority to cast a large number of votes did not.

We recognize that the legislator-plaintiffs' alleged injury shares certain characteristics with that asserted in <u>Raines</u>. Just as the legislator-plaintiffs in this case, the <u>Raines</u> plaintiffs did not assert a claim that they were "personally entitled" to cast an effective vote on revenue-raising measures in the sense that the authority at issue "runs . . . with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power." <u>Id.</u> at 821. But the same was true in <u>Coleman</u>, which the court declined to overrule despite a clear opportunity to do so. <u>See id.</u> at 825-26. If an elected official cannot sue on his own behalf to assert legislative prerogatives on the theory that his power properly belongs to his constituents, legislative standing would cease to exist outside the narrow category of

- 24 -

particularly unfair treatment exemplified by <u>Powell</u>.  This factor alone thus cannot be sufficient to defeat standing.

Some legislative standing cases have relied in part on the fact that a claimed injury impacted all members of a legislature in denying standing to a sub-group of legislators. In <u>Schaffer</u>, for example, the injuries alleged "necessarily damage[d] all Members of Congress equally."  240 F.3d at 885 (quoting <u>Raines</u>, 521 U.S. at 821) (alterations omitted).  And in <u>Kucinich</u>, the court held that a group of House members lacked standing to challenge alleged violations of the War Powers resolution partially on the basis that the claimed injury "impacts the whole of Congress—not solely the ten plaintiffs[] before the Court."  821 F. Supp. 2d at 117-18.  But both of these cases also rested in part on the "lost vote" rationale, the availability of internal legislative remedies, or separation-of-powers concerns, none of which are present in this case.  <u>See</u> <u>Schaffer</u>, 240 F.3d at 886 (plaintiffs received objectionable pay raise because they lost a vote, and could cure any injury "pursuant to the normal legislative process"); <u>Kucinich</u>, 821 F. Supp. 2d at 120 (plaintiffs "overlook the important role political remedies have in the standing analysis" by arguing their votes were nullified while "acknowledging that they retain legislative remedies").

In sum, the case under review differs from both <u>Coleman</u> and <u>Raines</u>—and the cases interpreting those decisions—in important respects.  We ultimately agree with the district court that the legislator-plaintiffs have sufficiently alleged an injury to the "plain, direct and adequate interest in maintaining the effectiveness of their votes," <u>Coleman</u>,

407 U.S. at 438, rather than relying only on an "abstract dilution of institutional legislative power," <u>Raines</u>, 521 U.S. at 826. On remand, the plaintiffs will be required to prove their allegations. But at this stage, assuming the truth of all well-pled allegations contained in the complaint, we conclude that the legislator-plaintiffs have satisfied <u>Coleman</u>'s requirements for legislative standing. We therefore hold that plaintiffs have suffered an injury in fact, and thus proceed to a brief discussion of causation and redressability.

<strong>B</strong>

To satisfy causation for standing purposes, plaintiffs must demonstrate that their injury is "fairly traceable to the challenged action of the defendant." <u>Defenders of Wildlife</u>, 504 U.S. at 560 (quotation and alterations omitted). And an injury is redressable if a court concludes it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Id.</u> at 561 (quotations omitted).

The Governor suggests that we construe the alleged injury as broadly as possible for purposes of analyzing causation. He selects two phrases from the operative complaint, arguing that plaintiffs' alleged injuries are a claimed slide into fiscal dysfunction and inadequate education funding. Neither injury, he suggests, is caused by TABOR or redressable by a decision invalidating it. As explained <u>supra</u>, however, the legislator-plaintiffs' alleged injury is not a lack of revenue flowing into state coffers but the elimination of their authority to make laws raising taxes or increasing spending. This injury is directly attributable to TABOR's requirement that any tax increase be approved

by Colorado voters. Plaintiffs seek a declaratory judgment that TABOR is null and void and an order prohibiting any state officer from enforcing TABOR's provisions. Such a judgment would allow the legislator-plaintiffs to vote directly for increased taxes, thereby redressing their alleged injury.[10]

## C

In addition to the Article III requirements for standing, we also consider prudential standing considerations. See Sac & Fox Nation of Mo. v. Pierce, 213 F.3d 566, 573 (10th Cir. 2000) (listing prudential standing principles). Governor Hickenlooper suggests that plaintiffs assert only a "generalized grievance shared in substantially equal measure by all or a large class of citizens." Warth v. Seldin, 422 U.S. 490, 499 (1975) (quotation omitted). We disagree. The Governor's argument again rests on the premise that the legislator-plaintiffs' claimed injury is nothing more than a decrease in the amount of tax revenue collected by the state. Such an alleged injury would constitute a generalized grievance. Courts should generally decline to hear cases based on nothing more than a plaintiff's disagreement with budgetary policies. See Valley Forge Christian Coll. v.

---

[10] To the extent that Governor Hickenlooper argues that the plaintiffs' Guarantee Clause claim is not redressable because it cannot be enforced against him, this assertion is contradicted by the Supreme Court's decision in Minor v. Happersett, 88 U.S. 162 (1875). There, the Court held that the Guarantee Clause "necessarily implies a duty on the part of the States themselves to provide such a government." Id. at 175. As Colorado's chief executive, Governor Hickenlooper bears responsibility for enforcing that guarantee on the state's behalf. See Developmental Pathways v. Ritter, 178 P.3d 524, 529-30 (Colo. 2008) (governor is generally proper defendant in suit challenging state constitutional amendment).

Ams. United for Separation of Church & State, 454 U.S. 464, 476-78 (1982).

We do not doubt that TABOR has a substantial effect on the state of Colorado and its citizens. But the injury the legislator-plaintiffs seek to redress, as explained in Parts II.A & B, supra, is particular to their positions as state legislators and is not "shared in substantially equal measure by all or a large class of citizens." Warth, 422 U.S. at 499. Only the one hundred members of the Colorado General Assembly can claim the disempowerment injury alleged here. Denying prudential standing in this case would be particularly problematic given our instruction that parties harmed by "generalized grievances should normally be directed to the legislative, as opposed to judicial, branches of government." Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002). As we have discussed, the legislator-plaintiffs cannot obtain a remedy through the legislative process.

Moreover, the Supreme Court has stressed that its prudential standing limitation on widely dispersed injuries "invariably appears in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature—for example, harm to the common concern for obedience to law." FEC v. Akins, 524 U.S. 11, 23 (1998) (quotation omitted). "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found injury in fact." Id. at 24 (quotation omitted); see also Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 449-50 (1989) ("The fact that other citizens or groups of citizens might make the same complaint

. . . does not lessen appellants' asserted injury . . . ."). As discussed in Part II.A, <u>supra</u>, we conclude that the legislator-plaintiffs have alleged a concrete injury.

Because neither the Article III standing requirements nor the asserted doctrine of prudential standing bars the legislator-plaintiffs' suit, we affirm the district court's rulings on legislative standing.

## III

We turn to another justiciability hurdle, the political question doctrine. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." <u>Japan Whaling Ass'n v. Am. Cetacean Soc'y</u>, 478 U.S. 221, 230 (1986). Applicability of the political question doctrine is a question of law that we review de novo. <u>Custer Cnty. Action Ass'n v. Garvey</u>, 256 F.3d 1024, 1031-32 (10th Cir. 2001).

## A

As a threshold matter, we must decide if the political question doctrine categorically precludes Guarantee Clause challenges against state constitutional amendments adopted by popular vote. There is some support for this position in Supreme Court cases predating the modern articulation of the political question doctrine in <u>Baker v. Carr</u>, 369 U.S. 186 (1962). But we conclude that neither <u>Luther v. Borden</u>, 48 U.S. (7 How.) 1 (1849), nor <u>Pacific States Telephone & Telegraph Co. v. Oregon</u>, 223 U.S. 118 (1912), precludes merits consideration in this case.

In Luther, the Supreme Court was asked to resolve a dispute that would have required it to determine which of two putative governments legitimately controlled Rhode Island at the time. On the basis that the issue "ha[d] been already decided by the courts of Rhode Island," the Court held that "[u]pon such a question the courts of the United States are bound to follow the decisions of the State tribunals." 48 U.S. at 40. The Court also discussed the Guarantee Clause, labeling the issue of which government was valid as "political in its nature," vested not in the judiciary but in Congress. Id. at 42. "Under [the Guarantee Clause] it rests with Congress to decide what government is the established one in a State." Id.

Pacific States involved a fact pattern similar to the one before us, but a much broader legal challenge. Shortly after Oregon amended its state constitution to permit lawmaking by initiative and referendum, the people enacted "a law taxing certain classes of corporations." Pac. States, 223 U.S. at 135. A corporation affected by the new tax challenged its legitimacy, alleging that "by the adoption of the initiative and referendum, the State violates the right to a republican form of government." Id. at 140 (quotation omitted). "In other words," said the Court, "the propositions [of error in the complaint] each and all proceed alone upon the theory that the adoption of the initiative and referendum destroyed all government republican in form in Oregon." Id. at 141. Construing the plaintiff's complaint as an attempt to overturn "not only . . . the particular statute which is before us, but . . . every other statute passed in Oregon since the adoption of the initiative and referendum," id., the Justices held "the issues presented, in their very

- 30 -

essence, [to be] . . . political and governmental, and embraced within the scope of powers conferred upon Congress," id. at 151.

Both the Luther and Pacific States claims differ from those at bar. Importantly, both cases involved wholesale attacks on the validity of a state's government rather than, as before us, a challenge to a single provision of a state constitution. See Pac. States, 223 U.S. at 150 (the "essentially political nature" of the question presented "is at once made manifest by understanding that the assault which the contention here advanced makes it not on the tax as a tax, but on the State as a State");[11] Luther, 48 U.S. at 47 (whether the people of a state "abolish[ed] an old government, and establish[ed] a new one in its place, is a question to be settled by the political power"). There can nevertheless be little doubt that these cases include language suggesting that Guarantee Clause litigation is categorically barred by the political question doctrine. In Luther, the Court stated that

---

[11] Contrary to the Governor's position, Pacific States did not involve an issue "identical to the one presented here." We are confronted with an allegation that one provision of the Colorado Constitution brings it below a constitutionally mandated threshold. Governor Hickenlooper directs us to the plaintiff's brief in Pacific States in support of his argument that the issues presented in the two cases are identical. According to that brief, the people of Oregon passed in 1910 an amendment similar in relevant respects to TABOR that required voter approval via referendum before certain taxes could be enacted. We note that the amendment was passed after the Oregon Supreme Court rendered the decision reviewed by the Pacific States Court, see Oregon v. Pac. States Tel. & Tel. Co., 99 P. 427 (Or. 1909), and it is therefore unclear whether that amendment was formally before the Court in Pacific States. In any event, the Court's opinion in Pacific States does not mention Oregon's prior approval amendment, which was repealed by the people in November 1912. We are unpersuaded that an argument briefed by one party but never addressed by the Court requires us to read Pacific States more narrowly than its framing of the issues suggests.

"Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not." 48 U.S. at 42. And when the Pacific States Court faced the question of "whether it is the duty of the courts or the province of Congress to determine when a State has ceased to be republican in form, and to enforce the guaranty of the Constitution on that subject," it declared that the issue was "political in character, and therefore not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress." 223 U.S. at 133.

Had those been the Supreme Court's final words on the justiciability of the Guarantee Clause, a categorical approach might be proper. However, the Court in Baker highlighted the proposition that its prior political question cases turned on a number of "attributes which, in various settings, diverge, combine, appear, and disappear in seeming disorderliness" and that much confusion had resulted "from the capacity of the 'political question' label to obscure the need for case-by-case inquiry." 369 U.S. at 210-11. After reviewing its prior cases applying the political question doctrine, the Court explained that "several formulations which vary slightly according to the settings in which the questions arise may describe a political question." Id. at 217.

Baker then announced six factors that render a case non-justiciable under the political question doctrine:

> [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent

> resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." Id. (emphasis added).

Given the clarity of this holding, we must agree with the plaintiffs that the six tests identified in Baker are the exclusive bases for dismissing a case under the political question doctrine. Furthermore, the Baker Court explicitly rejected a categorical Guarantee Clause bar. Immediately after announcing the six political question factors, the Court addressed the argument that the case under its consideration "shares the characteristics of decisions that constitute a category not yet considered, cases concerning the Constitution's guaranty, in Art. IV, § 4, of a republican form of government." Baker, 369 U.S. at 217-18. It determined that the prior cases in which the Court had considered "Guaranty Clause claims involve those elements which define a 'political question,'" referencing the aforementioned six factors, "and for that reason and no other, they are nonjusticiable." Id. at 218 (emphasis added). "[N]onjusticiability of such claims has nothing to do with their touching upon matters of state governmental organization." Id.

The Baker opinion includes a lengthy discussion of Luther, ultimately concluding that the decision rested on four of the six previously identified factors:

> the commitment to the other branches of the decision as to which is the lawful state government; the unambiguous action by the President, in

recognizing the charter government as the lawful authority; the need for finality in the executive's decision; and the lack of criteria by which a court could determine which form of government was republican.

Id. at 222. A reading of Luther under which "the political question barrier was . . . absolute" was rejected, with the Court continuing that in some circumstances a court could determine "the limits of the meaning of 'republican form,' and thus the factor of lack of criteria might fall away." Id. at 222 n.48. Even then, however, "there would remain other possible barriers to decision because of primary commitment to another branch, which would have to be considered in the particular fact setting presented." Id. In recognizing Luther as standing solely for the proposition that "the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government," it clarified that it had consistently declined to resort to the clause as a "standard for invalidating state action." Id. at 223.

More recently, the Supreme Court has continued to decline interpretation of its political question doctrine precedent as categorically barring Guarantee Clause litigation. In New York v. United States, 505 U.S. 144 (1992), the Court expressed displeasure that Luther's "limited holding metamorphosed into the sweeping assertion that violation of the great guaranty of a republican form of government in States cannot be challenged in the courts." Id. at 184 (quotation omitted). The Supreme Court stressed that it has "addressed the merits of claims founded on the Guarantee Clause without any suggestion that the claims were not justiciable." Id. (citing Att'y Gen. of Mich. ex rel. Kies v.

- 34 -

Lowrey, 199 U.S. 233, 239 (1905); Forsyth v. Hammond, 166 U.S. 506, 519 (1897); In re Duncan, 139 U.S. 449, 461-62 (1891); Minor, 88 U.S. at 175-76).  And although the Court did not address the issue directly, it noted that modern decisions have "suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions," id. at 185, quoting the statement in Reynolds v. Sims, 377 U.S. 533, 582 (1964) that "[s]ome questions raised under the Guarantee Clause are nonjusticiable."

Relying on the Court's directive in Baker that "there should be no dismissal for non-justiciability on the ground of a political question's presence" absent one of the specifically identified factors, 369 U.S. at 217, we reject the proposition that Luther and Pacific States brand all Guarantee Clause claims as per se non-justiciable.

**B**

We must yet apply the six-factor test announced in Baker.  For the convenience of the reader, we restate the Baker factors, inserting in brackets an Arabic number before each of the six tests, and proceed to a discussion of those factors.

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217.

- 35 -

**1**

Initially, we consider whether the Guarantee Clause manifests "a textually demonstrable constitutional commitment of the issue to a coordinate political department." Id. The Guarantee Clause provides: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. Const. art. IV, § 4.

The text of the Guarantee Clause does not mention any branch of the federal government. It commits the "United States"—which would normally be read as including the Article III courts—to the preservation of republican government in the states. The Guarantee Clause is found not in Article I or Article II, where we would expect to find it if its provisions were textually committed to another branch, but in Article IV. Moreover, two other provisions of Article IV specifically empower Congress to act, but the Guarantee Clause does not. See id. § 1 ("[T]he Congress may by general Laws prescribe the Manner in which [public] Acts, Records, and Proceedings shall be proved, and the Effect thereof."); id. § 3 ("New states may be admitted by Congress into this Union . . . Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). The omission of any mention of Congress from the Guarantee Clause, despite Congress' prominence elsewhere in Article IV, indicates there is no "textually demonstrable commitment"—certainly not an inextricable one—barring our review or district court

- 36 -

consideration of this case. Baker's refusal to bar Guarantee Clause claims on an "absolute" basis would be rendered a nullity if the clause itself contained a textual commitment to the coordinate political branches. 369 U.S. at 222 & n.48.

As part of its discussion of Luther, the Baker opinion stated that "Chief Justice Taney . . . found further textual and practical reasons for concluding that, if any department of the United States was empowered by the Guaranty Clause to resolve the issue, it was not the judiciary." 369 U.S. at 220. Note that the "issue" referenced was not whether a state government had fallen below a minimum constitutional threshold, but "what government is the established one in a State." Id. (quoting Luther, 48 U.S. at 42). The quoted passage explains that "when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority." Id. (quoting Luther, 48 U.S. at 42).

Inexorably, the Baker Court concluded that Congress was the appropriate authority for determining "which is the lawful state government." 369 U.S. at 222. This conclusion follows logically from the Constitution's text, which makes Congress the arbiter of congressional elections. See U.S. Const. art. I, § 5, cl. 1 ("Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . . ."). Yet, possibility of congressional action does not preclude a judicial determination regarding whether an admittedly established state government has later adopted an impermissibly un-republican state constitutional provision. The Pacific States opinion does not identify

any textual commitment of authority, but it too dealt with a claim that "assail[ed] . . . the rightful existence of the State." 223 U.S. at 141-42; see also id. at 151 (plaintiffs "demand of the State that it establish its right to exist as a State").[12] We must read Luther's statement regarding recognition of congressional delegates, 48 U.S. at 42, in that context: When choosing between slates of representatives from two competing governments, congressional admission of one slate over the other would seem to imply recognition of one putative government as the proper (and republican) representatives of the citizenry. And given the textually demonstrable commitment to Congress the role of determining the "Elections, Returns and Qualifications of its own Members," U.S. Const. art. I, § 5, cl. 1, we would not hesitate to conclude that the first Baker test would forbid the judiciary from choosing between two putative state governments. That is not this case, however; the legislator-plaintiffs do not challenge the representative legitimacy of Colorado's current government or the authority of its congressional delegation to serve in Washington. Looking to the "particular fact setting presented," as Baker directed, 369 U.S. at 222 n.28, we discern no textual commitment of the narrow issue raised by the plaintiffs to a coordinate political branch.

---

[12] Similarly, in Hanson v. Flower Mound, 679 F.2d 497 (5th Cir. 1982) (per curiam), the court summarily rejected a pro se litigant's claim that "the government of the Town of Flower Mound is a nullity" based on a violation of the Guarantee Clause. Id. at 499, 502. Assuming the Clause applied to municipalities, the Court concluded that "the question whether a government is a nullity because its form violates the Clause is a nonjusticiable political question." Id. at 502 (citing Luther, 48 U.S. at 42).

We are similarly unpersuaded that a "lack of judicially discoverable and manageable standards," id. at 217, precludes judicial review of this lawsuit. As construed by Baker, the Luther decision rested in part on the lack of criteria for determining which government was legitimately republican. See 369 U.S. at 222. We reiterate that this holding rests on the impossibility of applying judicial standards to choose between two governments that each claim to be valid, rather than any extraordinary vagueness in the text of the Guarantee Clause itself. The Luther Court asked "by what rule could it have determined the qualification of voters upon the adoption or rejection of the proposed constitution, unless there was some previous law of the State to guide it," and answered: The Court lacks "the right to determine what political privileges the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision." 48 U.S. at 41. That is not this case.

There is sparse judicial precedent interpreting the Guarantee Clause to aid our analysis. Even Guarantee Clause cases in which the Supreme Court declined to invoke the political question doctrine do not provide much meaningful guidance in this case. See Kies, 199 U.S. at 239 ("If the legislature of the State has the power to create and alter school districts and divide and apportion the property of such districts . . . the action of the legislature is compatible with a republican form of government . . . ."); Minor, 88 U.S. at 175-76 (depriving women of the franchise did not violate Guarantee Clause because none of the original thirteen states nor any state admitted to that point "save

perhaps New Jersey" allowed women to vote). "Judicially manageable standards" must include—but cannot be limited to—precedent. We must not "hold[] a case nonjusticiable under the second Baker test without first undertaking an exhaustive search for applicable standards." Alperin v. Vatican Bank, 410 F.3d 532, 552 (9th Cir. 2005).

Before the Supreme Court's decision in District of Columbia v. Heller, 554 U.S. 570 (2008), there was similarly sparse judicial interpretation of the Second Amendment at both the state and federal levels. Precedent that did exist included a Supreme Court case that had long been understood as foreclosing the suggestion that the Second Amendment protects an individual right. See United States v. Miller, 307 U.S. 174, 178 (1939). Outside the judiciary, historians and law professors studied the meaning of the Amendment, relying on sources typically used to aid constitutional interpretation: dictionaries, ratification history, contemporary treatises, and the like. Meanwhile, states and localities had developed various provisions regulating firearms. Such legislative enactments became relevant because courts, including the Heller Court, were willing to consider the rarity of state enactments in determining whether they are constitutionally permissible. 554 U.S. at 629 ("Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."). There is no evidence that the Court in Heller even considered the possibility that the sources available to it could be insufficient for developing judicially discoverable and manageable standards.

As it was with the Second Amendment, so it is with the Guarantee Clause. We are directed, by both parties and by various amici, to sources that courts have relied on for

- 40 -

centuries to aid them in constitutional interpretation. Briefing directs us to several of the Federalist Papers, founding-era dictionaries, records of the Constitutional Convention, and other papers of the founders. We have the authority to take judicial notice of other state constitutional provisions regulating the legislature's power to tax and spend. See Fed. R. Evid. 201(b). At this stage of the litigation, we must strike a delicate balance between acknowledging that repositories of judicially manageable standards exist and allowing further record development in the district court before the merits of the case are adjudicated. See Largess v. Supreme Judicial Court for the State of Mass., 373 F.3d 219, 225 (1st Cir. 2004) (per curiam) ("[R]esolving the issue of justiciability in the Guarantee Clause context may also turn on the resolution of the merits of the underlying claim."). Without reaching or considering the merits, we note the ready availability of sources providing judicially manageable guidance on the meaning of the Guarantee Clause. We are unwilling to allow dicta suggesting that the Guarantee Clause is per se nonjusticiable to become a self-fulfilling prophecy; in order to develop judicially manageable standards, courts must be permitted to reach the stage of litigation where such standards are developed.

Our holding comports with the holdings of other circuits that have applied the second prong of Baker. We are not asked to second-guess military decisions, see Aktepe v. United States, 105 F.3d 1400, 1404 (11th Cir. 1997) ("[C]ourts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life."), nor must we consider sensitive foreign policy

- 41 -

issues, see Schneider v. Kissinger, 412 F.3d 190, 196 (D.C. Cir. 2005) (declining to determine whether "it was proper for an Executive Branch official . . . to support covert actions against" a foreign official (quotation omitted)).

In Wang v. Masaitis, 416 F.3d 992 (9th Cir. 2005), the Ninth Circuit applied the Baker factors to a case that would have required it to "decide whether, under the Treaty Clause of the Constitution, the United States may enter into a 'treaty' with a non-sovereign entity." Id. at 993. It discussed "Baker's distinction between discerning a nation's sovereignty (a political question) and interpreting the impact of that status on the law (a judicial one)." Id. at 995. Considering the second and third Baker factors together, the Ninth Circuit held: "'Resolution of the question may not be easy, but it only requires us to apply normal principles of interpretation to the constitutional provisions at issue.'" Id. at 996 (quoting Goldwater v. Carter, 444 U.S. 996, 999 (1979) (Powell, J., concurring)). The same is true in this case. We cannot identify any feature of the Guarantee Clause that makes it unamenable to "normal principles of interpretation."

Under Fed. R. Civ. P. 8(a)(2), a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." The Governor notes that we relied on the plaintiffs' initial pleadings to apply the Baker test in Schroeder v. Bush, 263 F.3d 1169 (10th Cir. 2001). But we did not hold that plaintiffs must incorporate into their complaint every legal source relevant to the applicable standard. Our review of the record and briefing in this case satisfies us that judicially discoverable and manageable standards for Guarantee Clause litigation exist. An attempt to define those standards

- 42 -

thoroughly would necessarily implicate adjudication on the merits not appropriate for interlocutory appeal.

**3**

With respect to the third <u>Baker</u> test, we conclude that resolving this case will not require the making of a "policy determination of a kind clearly for nonjudicial discretion." <u>Baker</u>, 369 U.S. at 217. TABOR is a hotly contested issue in Colorado that has had a wide-ranging influence on the state's fiscal policy. But the interpretation of constitutional text—even vague constitutional text—is central to the judicial role. <u>See</u> <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judiciary to say what the law is."). We "cannot avoid [our] responsibility merely because the issues have political implications." <u>Zivotofsky ex rel. Zivotofsky v. Clinton</u>, 132 S. Ct. 1421, 1428 (2012) (quotation omitted).

We agree with the district court that this lawsuit is distinguishable from others in which courts have invoked the "policy determination" prong in <u>Baker</u>. <u>See, e.g.</u>, <u>Schroeder</u>, 263 F.3d at 1175 ("Courts are ill-equipped to make highly technical, complex, and on-going decisions regarding how to maintain market conditions, negotiate trade agreements, and control currency."); <u>Ad Hoc Comm. on Judicial Admin. v. Massachusetts</u>, 488 F.2d 1241, 1245 (1st Cir. 1973) (concluding that "the financing and, to an important extent, the organization of the judicial branches" requires a policy

determination);[13] Orlando v. Laird, 443 F.2d 1039, 1043 (2d Cir. 1971) ("[D]ecisions regarding the form and substance of congressional enactments authorizing hostilities are determined by highly complex considerations of diplomacy, foreign policy, and military strategy inappropriate to judicial inquiry."). Plaintiffs do not ask the court to balance delicate policy matters similar to market conditions, budgeting priorities, or foreign policy concerns. Instead, they seek a ruling as to whether state government under TABOR is republican in form.

If adjudicating this case required us or the district court to determine the wisdom of allocating certain traditionally legislative powers to the people, the third Baker factor would dictate dismissal. But deciding whether a state's form of government meets a constitutionally mandated threshold does not require any sort of "policy determination" as courts applying the Baker tests have understood that phrase. The case before us requires that we determine the meaning of a piece of constitutional text and then decide whether a state constitutional provision contravenes the federal command. See Goldwater, 444 U.S. at 999 ("Resolution of the question . . . requires us to apply normal principles of interpretation to the constitutional provisions at issue.").

---

[13] Ad Hoc Committee also includes the following language: "[I]t would be both unprecedented and unseemly for a federal judge to attempt a reordering of state priorities." 488 F.2d at 1245-46. We note that "priorities," as used in that case, refers directly to budget priorities. Plaintiffs alleged that the state's inadequate judicial financing violated their constitutional rights and requested as a remedy the "enlargement and restructuring of the entire state court system." Id. at 1243. The plaintiffs in this case seek no similar relief and do not ask the federal courts to become involved in the minutiae of Colorado's budget.

**4**

We dispense briefly with the remaining three <u>Baker</u> factors: "[4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217. These factors are best understood as promoting separation-of-powers principles in cases featuring prior action on an issue by a coordinate branch. <u>See</u> <u>Goldwater</u>, 444 U.S. at 1000 (Powell, J., concurring) ("[T]he political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government.").

We are aware of no action taken by either Congress or the executive with respect to this litigation specifically or TABOR generally. Both the people and courts of Colorado have made pronouncements on TABOR. However, the possibility that federal judicial decisions will conflict with a state referendum or a state court decision does not implicate the political question doctrine. Such conflicts are an ordinary part of the judicial process. <u>See, e.g.</u>, <u>Romer v. Evans</u>, 517 U.S. 620 (1996) (striking down Colorado's popularly enacted Amendment 2 as unconstitutional); <u>Gallegos v. Colorado</u>, 370 U.S. 49 (1962) (reversing decision of Colorado Supreme Court). TABOR's ratification by the people of Colorado was a "political decision," <u>Baker</u>, 369 U.S. at 217, but it was not a decision of the sort that we must adhere to unquestioningly. <u>See Gross v.</u>

- 45 -

German Found. Indus. Initiative, 456 F.3d 363, 390 (3d Cir. 2006) ("As Baker makes clear, the fifth factor contemplates cases of an 'emergency[] nature' that require 'finality in the political determination,' such as the cessation of armed conflict." (quoting Baker, 369 U.S. at 213-14 (alteration in Gross))).

We thus affirm the district court's conclusion that the specific Guarantee Clause claim asserted in this case is not barred by the political question doctrine.

**IV**

Governor Hickenlooper argues that the operative complaint fails to state a claim upon which relief can be granted because Colorado's government remains republican in form after the passage of TABOR. The Governor did not assert this traditional Fed. R. Civ. P. 12(b)(6) argument to the district court with respect to the Guarantee Clause claim; he sought dismissal of that claim only on standing, prudential standing, and political question grounds. And the district court order over which we exercise interlocutory review decided only the questions properly presented. Although we may exercise our discretion in certain circumstances to reach issues "fairly included" in an order subject to interlocutory review, we "may not reach beyond the certified order." Rural Water Dist. No. 4 v. City of Eudora, 720 F.3d 1269, 1278 (10th Cir. 2013) (citations omitted); see also Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205 (1996) ("The court of appeals may not reach beyond the certified order . . . ."); Moore v. Liberty Nat'l Life Ins. Co., 267 F.3d 1209, 1219-20 (11th Cir. 2001) (declining to consider statute of limitations claim on interlocutory appeal because of insufficient development of claim at district

court level); 16 Charles Alan Wright et al., Federal Practice & Procedure, § 3929, at 456-57 (3d ed. 2012) ("[T]he court of appeals will not consider matters not yet ruled upon by the district court."). Because the order at issue in this limited interlocutory appeal does not include a decision as to whether the Guarantee Clause claim asserted by plaintiffs plausibly states a basis for relief under Fed. R. Civ. P. 12(b)(6), we cannot address that question. We stress that our decision on plaintiffs' Guarantee Clause claim is quite limited, leaving all issues other than standing, prudential standing, and the political question doctrine to the district court.

V

Plaintiffs also allege that TABOR violates § 4 of the Colorado Enabling Act, which requires "[t]hat the constitution [of Colorado] shall be republican in form." Colorado Enabling Act, ch. 139, § 4, 18 Stat. 474, 474 (1875). The district court concluded that even if the Guarantee Clause claim were found non-justiciable on political question grounds, plaintiffs could proceed with their statutory Enabling Act claim. The Governor raises the same standing and political question challenges to the Enabling Act claim as to the Guarantee Clause claim. We do not need to conduct a separate Article III standing inquiry for the Enabling Act claim because the injury, causation, and redressability analyses are identical regardless of whether the claim for relief is statutory or constitutional. See Parts II.A & B, supra. Similarly, our prudential standing analysis above applies with equal force to the Enabling Act claim—we have already decided that the legislator-plaintiffs' particular claim does not constitute a generalized grievance. See

Part II.C, supra.

We agree with the district court that the political question analysis is not identical for statutory and constitutional claims.  In Japan Whaling, the Supreme Court held that "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."  478 U.S. at 230.  To be sure, the mere fact that a claim is statutory does not automatically obviate political question concerns.  See Spectrum Stores, Inc. v. Citgo Petroleum Corp., 632 F.3d 938, 943 (5th Cir. 2011) (declining to adjudicate "challenge [to] the structure of OPEC and its relation to the worldwide production of petroleum"); Lin v. United States, 561 F.3d 502, 504 (D.C. Cir. 2009) (invoking political question doctrine where issue would have required determining "who exercises sovereignty over Taiwan"); Crockett v. Reagan, 720 F.2d 1355, 1356 (D.C. Cir. 1983) (per curiam) (political question doctrine barred challenge to U.S. military presence in Ecuador notwithstanding statutory War Powers Resolution).  In each of these cases, the court could not address the question presented without rendering a decision on a question of foreign policy, thereby risking either "expressing lack of the respect due coordinate branches of government" or "potentiality of embarrassment from multifarious pronouncements by various departments on one question."  Baker, 369 U.S. at 217.  Neither danger is present in the case before us.

The Supreme Court's recent decision in Zivotofsky elucidates the difference between the judiciary "being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination" of foreign policy, 132 S. Ct. at

1427, and "enforc[ing] a specific statutory right," id. In the instant case, we are asked to decide "if [plaintiffs'] interpretation of the [Colorado Enabling Act] is correct." Id. And at this stage of litigation, we must determine only if federal courts are empowered to make that decision. We hold that they are, and that the Enabling Act claim is independently justiciable for reasons that do not apply to the Guarantee Clause claim. See El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 856 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("This is a statutory case. The Supreme Court has never applied the political question doctrine in a case involving alleged statutory violations. Never.").

## VI

We emphasize once again that this interlocutory appeal allows us to consider only whether the legislator-plaintiffs have established Article III standing and whether prudential standing jurisprudence or the political question doctrine precludes consideration of their Guarantee Clause and Enabling Act claims. Our answer to those questions completes our role at this stage of the proceedings.

We **AFFIRM** the standing and political question rulings of the district court and **REMAND** for further proceedings.