**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**July 22, 2014**

**FOR THE TENTH CIRCUIT**
_____

ANDY KERR, Colorado State
Representative, et al.,

     Plaintiffs - Appellees,

v.

JOHN HICKENLOOPER, Governor of
Colorado, in his official capacity,

     Defendant - Appellant.

------------------------------

DARCY W. STRAUB, et al.,

     Amici Curiae.

No. 12-1445
(D.C. No. 1:11-CV-01350-WJM-BNB)

_____

**ORDER**
_____

Before **BRISCOE**, Chief Judge, **KELLY**, **LUCERO**, **HARTZ**, **TYMKOVICH**,
**GORSUCH**, **HOLMES**, **BACHARACH**, **PHILLIPS**, and **MCHUGH**, Circuit Judges.[*]
_____

     This matter is before the court on the appellant's *Petition for Rehearing En Banc.*

We also have a response. The implicit request for panel rehearing contained in

appellant's petition is denied by the original hearing panel. The entire petition, as well as

_____

     [*] The Honorable Scott Matheson is recused in this matter and did not participate in
the en banc proceedings.

the response, was also circulated to all of the judges of the court who are in regular active service. A poll was called, and a majority of the court voted to deny the en banc request. *See* Fed. R. App. P. 35(a). Judges Hartz, Tymkovich, Gorsuch and Holmes voted to allow en banc reconsideration.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

12-1445, *Kerr v. Hickenlooper*

**HARTZ**, Circuit Judge, dissenting from the denial of rehearing *en banc*:

I respectfully dissent from the denial of en banc review. We are bound by Supreme Court precedent to hold that the Guarantee Clause claim is nonjusticiable as a political question.

The Guarantee Clause provides: "The United States shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, §4. The claim in this case is that TABOR, an amendment to the Colorado constitution adopted by voter initiative, violates the Guarantee Clause by requiring advance voter approval of new taxes. A quite similar claim was raised in the United States Supreme Court in *Pacific States Telephone & Telegraph Company v. Oregon*, 223 U.S. 118 (1912). Oregon had amended its constitution to allow the enactment of legislation through an initiative or referendum. One statute so enacted imposed a tax on Pacific States. The company defended against collection of the tax on the ground that the initiative process violated the Guarantee Clause. The Supreme Court held that the claim based on the Guarantee Clause was a political question and "not, therefore, within the reach of judicial power." *Id.* at 151. The provisions in the Oregon and Colorado constitutions are obviously not identical. But I am at a loss to find a principled basis on which to hold that the challenge in *Pacific States* was a political question while the challenge here is not. In both, the gist of the claim has been that the Guarantee Clause was violated by the transfer of legislative power from the legislature to the electorate.

The panel opinion attempts to distinguish *Pacific States* on the ground that it raised "a much broader legal challenge" than does this case. *Kerr v. Hickenlooper*, 744 F.3d 1156, 1173 (10th Cir. 2014). To support that characterization, the panel opinion quotes from a passage in the Supreme Court's opinion. The passage follows the Court's discussion of the assignments of error raised by Pacific States in its brief to the Court. The Court stated that those assignments were "reduced to six propositions, which really amount to but one, since they are all based upon the single contention that the creation by a state of the power to legislate by the initiative and referendum causes the prior lawful state government to be bereft of its lawful character as the result of the provisions of [the Guarantee Clause]." *Pac. States Tel. & Tel. Co.*, 223 U.S. at 137. After quoting the six propositions in Pacific States' brief, the Court wrote:

> *In other words, the propositions each and all proceed alone upon the theory that the adoption of the initiative and referendum destroyed all government republican in form in Oregon.* This being so, the contention, if held to be sound, would necessarily affect the validity, *not only* of *the particular statute which is before us, but* of *every other statute passed in Oregon since the adoption of the initiative and referendum.* And indeed, the propositions go further than this, since in their essence they assert that there is no governmental function, legislative or judicial, in Oregon, because it cannot be assumed, if the proposition be well-founded, that there is, at one and the same time, one and the same government, which is republican in form, and not of that character.

*Id.* at 141 (emphasis added to language that is quoted by panel opinion).

This passage set forth the Court's view of the implications of Pacific State's argument, not what was actually stated in its brief. Nowhere did the brief argue, or even

2

suggest, that everything done by any branch of the Oregon state government was illegitimate after approval of the constitutional provision allowing initiatives and referenda. The brief simply argued, as one would expect, that the tax was improper because the initiative process—under which the tax was enacted—was unlawful under the Guarantee Clause. Nor did the Supreme Court "[c]onstru[e] the . . . complaint as an attempt to overturn 'not only . . . the particular statute which is before us, but . . . every other statute passed in Oregon since the adoption of the initiative and referendum.'" *Kerr*, 744 F.3d at 1173 (quoting *Pacific States*, 223 U.S. at 140). Rather, it said only that if Pacific States' arguments in its brief (not the complaint) were sound, then all other legislation (even if not adopted by initiative or referendum) would also fall. In other words, the Court was saying that either Oregon had a republican form of government or it did not; if Pacific States was correct in saying that the initiative process violated the Guarantee Clause, then the whole state government came tumbling down because it was not republican in form. The Court rejected, albeit *sub silentio*, the possibility that the Court could just invalidate the one feature of the Oregon government—the initiative process—that was incompatible with a republican form of government.

One can challenge the cogency of the reasoning in *Pacific States*. Professor Tribe wrote: "Chief Justice White's decisive assumption was, to say the least, dubious: if a court found that a particular feature of state government rendered the government unrepublican, why could not the court simply declare that feature invalid?"

3

1 Laurence H. Tribe, *American Constitutional Law* § 3-13, at 369 (3d ed. 2000). But we cannot ignore Supreme Court precedent just because we think it poorly reasoned. And the Supreme Court has never questioned the holding of nonjusticiability in *Pacific States*. At most, in *New York v. United States*, 505 U.S. 144 (1992), it indicated that there may be some questions under the Clause that are justiciable. *See id.* at 184–86. Neither *New York* nor any other Supreme Court opinion since *Pacific States*, however, has cast doubt on the validity of the nonjusticiability holding of that opinion. Even *Baker v. Carr*, 369 U.S. 186 (1962), which formulated a new framework for assessing whether a claim raises a nonjusticiable political question, *see id.* at 208–37, did not call into question *Pacific States* or any other decision under the Guarantee Clause. Indeed, commenting on the possibility that the appellants might have raised a claim under the Clause, the Court said, "Of course, as we have seen, any reliance on that clause would be futile." *Id.* at 227.

Because I think it clear that Supreme Court precedent holds that the Guarantee Clause claim in this case is nonjusticiable, I vote for en banc review to correct the panel's error.

12-1445, *Kerr v. Hickenlooper*

**TYMKOVICH**, Circuit Judge, joined by **HOLMES**, Circuit Judge, dissenting from denial of Rehearing Petition, *En Banc*

I would hear this case en banc. The panel's decision mistakenly extends the doctrine of legislative standing, as articulated in *Raines v. Byrd*, 521 U.S. 811 (1997), and contradicts Supreme Court precedent as to the non-justiciability of the Guarantee Clause, U.S. Const. art. IV, § 4. Because the issues presented in this case are of exceptional importance to the separation of powers that undergirds our constitutional structure, I would grant Governor Hickenlooper's petition.

Colorado's Taxpayers Bill of Rights (TABOR), Colo. Const. art. X, § 20, is a state constitutional provision that requires a vote of the people before new taxes can be imposed or tax rates can be increased. The legislator-plaintiffs argue that they are injured by this constitutional provision because TABOR dilutes their core legislative prerogative to increase taxes and that this injury confers Article III standing.

But many state constitutional provisions cause the same type of injury. The net result of the panel's decision ratifying standing is that *just about any policy provision codified in the state constitution would be subject to legislative standing and attack on the theory of vote dilution*.

Thus, consider the effect of this view of legislative standing:

• According to the panel's logic, state legislators would have standing to

challenge the state constitution's protection of the recreational use of marijuana, Colo. Const., art. XVIII, § 16, on the theory that the provision infringes on the legislative core function of codifying the criminal law.

- Legislators would also have standing to challenge the mandatory school funding provision of the state constitution, Colo. Const., art. IX, § 17, because it deprives them of their right to cast effective votes on appropriations and education policy.

- Legislators are required to divvy up funds from casino gambling to specific recreational and environmental uses under the Great Outdoors Colorado Amendment, Colo. Const., art. XXVII, § 1. They could argue this requirement injures their ability to spend the money on other pressing social issues.

- And on and on and on throughout the Colorado Constitution (and the constitutions of other Tenth Circuit states).

The panel's view of legislative standing reaches well beyond Supreme Court precedent. And by remanding for further proceedings under the Guarantee Clause, the decision squarely conflicts with longstanding Supreme Court precedent that holds such inquiries are beyond the scope of federal-court review.

### *Legislative Standing*

Article III standing requires the plaintiff to have a suffered an "injury in fact," a causal connection between the injury and the challenged conduct, and that

2

the injury be redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Consistent with Article III's strict standing requirements, it is rare for legislators to have standing to challenge a law or action that results in a loss of the legislature's political power. That is because institutional injuries of this kind are shared by all members of the legislature, so plaintiffs suing in their legislative capacities usually cannot establish a "concrete and particularized" injury for standing purposes. *Id.* at 560.

In this light, the Supreme Court has held that the "abstract dilution of institutional legislative power" is not a judicially cognizable injury for purposes of individual legislators' standing. *Raines*, 521 U.S. at 826. *Raines* reserves a narrow exception to the rule against legislative standing—those actions that result in "vote nullification." *Id.* (citing *Coleman v. Miller*, 307 U.S. 433, 438 (1939) (holding that legislator-plaintiffs' votes were nullified if their votes against ratification of a constitutional amendment were "overridden")).

The legislator-plaintiffs in this case have alleged that TABOR violates the United States Constitution's Guarantee Clause, which provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government . . . ." U.S. Const. art. IV, § 4. They argue that the Guarantee Clause requires state constitutions to preserve state legislators' ability to perform "legislative core functions," which the plaintiffs contend include taxation and appropriation. *Kerr v. Hickenlooper*, 744 F.3d 1156, 1165 (10th Cir. 2014).

3

TABOR, because it requires successful legislative votes in favor of tax increases or new taxes to be approved by citizen referendum before being implemented, has allegedly resulted in injury to them as lawmakers. In this way, TABOR reduces the legislators' authority to cast fully effective votes in favor of tax increases.

In *Raines*, the Supreme Court held that plaintiffs, members of Congress, did not have standing to challenge the Line Item Veto Act, rejecting an argument that the Act denied them the "meaning" and "effectiveness" of their votes on appropriations bills. 521 U.S. at 825–26. The plaintiffs alleged the Act deprived them of their "plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.* at 821–22 (relying on *Coleman*, 307 U.S. at 438). Rejecting a broad approach, the Court held that legislative standing exists only where plaintiffs' votes have been "completely nullified" or "deprived of all validity." *Id.* at 822–23. The Court concluded that the line item veto caused abstract dilution of Congress's power, rather than vote nullification, and thus the plaintiffs' alleged injury was not judicially cognizable. *Id.* at 826.

The panel sees a distinction between this case and *Raines*—the lack of legislative remedies available to the plaintiffs under TABOR. The lack of legislative remedies is, of course, relevant to determining whether the plaintiffs have suffered complete nullification of their votes. But all of the cases cited by the panel stand for the proposition that legislator-plaintiffs do not suffer complete nullification of their votes where legislative remedies remain available. *See, e.g.*,

4

*Schaffer v. Clinton*, 240 F.3d 878, 885–86 (10th Cir. 2001). The inverse is not necessarily true—the lack of legislative remedies is necessary, but not sufficient, to show vote nullification. The dispositive question is whether the injury caused by TABOR constitutes vote nullification as understood in *Raines*. It does not.

The plaintiffs' theory of the case is that their votes are ineffective in light of the requirements of the Guarantee Clause because the "end result of a successful legislative vote in favor of a tax increase is not a change in the law." *Kerr*, 744 F.3d at 1165. Put another way, the right to an "effective" vote for standing purposes is the right to have a successful vote given its *full* effect under the relevant constitutional provision, not just *some* legal effect.

But, in *Raines*, the Court rejected a similar argument. According to the *Raines* plaintiffs, the legislation rendered their future votes ineffective in light of the requirements of the Presentment Clause because all approved appropriations were no longer inextricably linked for the President's signature or veto. *See Raines*, 521 U.S. at 825. The Court described this change in effectiveness as "abstract dilution of institutional legislative power" rather than "vote nullification." *Id.* at 826. The Court further noted that "[i]n the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process." *Id.* at 824. The Court thus rejected the idea that the failure to give a successful vote its full effect under the Presentment Clause was a judicially cognizable injury to the plaintiffs as lawmakers—the claim was, rather,

5

"based on a loss of political power." *Id.* at 821.

The panel's view of *Raines* makes any state constitutional provision that limits a legislature's authority over a policy area vulnerable to legislative standing on a Guarantee Clause claim. But TABOR and the other constitutional provisions described above do not completely nullify the plaintiffs' votes nor deprive their votes of all validity. As to TABOR, a new tax or tax increase that passes the General Assembly and is signed by the governor is referred to the statewide ballot for a voter referendum and may indeed become law. A successful vote still has substantial legal effect. Although the legal effect of a successful vote is less than it might have been without TABOR, *Raines* makes clear that abstract institutional injuries of this kind cannot confer legislative standing.

Further, even if it were plausible that votes for tax increases were not given legal effect, the resulting injury falls far short of the type of institutional injury at issue in *Coleman*. In *Raines*, the Supreme Court noted that *Coleman* allows for legislative standing when there has been "complete nullification" of a vote for a "specific legislative Act." *Id.* at 823. In this case, the legislator-plaintiffs have not voted in favor of a successful tax measure that was subsequently denied in a referendum. The panel attempts to explain away the "specific legislative Act" requirement by asserting it would be absurd if legislators could bring a claim for nullification of a specific vote but not for "nullification of a legislator's authority

6

to cast a large number of votes." *Kerr*, 744 F.3d at 1170. But *Raines* stands for that precise proposition: legislative standing is limited to claims of nullifications of specific, otherwise valid votes. The withdrawal of authority to cast a large number of votes with a particular degree of effectiveness is another way of alleging that the legislature has suffered an abstract institutional injury. Without the complete nullification of an actual vote, there is no concrete injury under *Raines*.

Even if the legislator-plaintiffs are correct on the merits of their argument —that TABOR's reduction of legislative authority violates the Guarantee Clause—the federal courts can only hear claims made by plaintiffs who have suffered a judicially cognizable injury. An abstract reduction of authority to raise taxes is an institutional injury based on the dilution of political power. This cannot serve as a basis for legislative standing.

### *Political Question Doctrine*

I also see no basis for the panel's conclusion that the Supreme Court has retreated from considering Guarantee Clause challenges to be non-justiciable under the political question doctrine. And, in particular, as I explain further below, the Court has held that Guarantee Clause challenges to statewide direct democracy provisions, like TABOR, are non-justiciable.

Federal courts lack authority to hear cases that involve a "political question." The Supreme Court has held that a case "involves a political

7

question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).

The Supreme Court has long maintained that Guarantee Clause claims are generally non-justiciable under the political question doctrine. *See, e.g.*, *City of Rome v. United States*, 446 U.S. 156, 183 (1980) ("We do not reach the merits of the appellants' argument that the Act violates the Guarantee Clause, Art. IV, § 4, since that issue is not justiciable."), *abrogated on other grounds by Shelby Cnty. v. Holder*, 133 S. Ct. 2612 (2013); *Baker v. Carr*, 369 U.S. 186, 218 (1962).

The panel's conclusion that Guarantee Clause claims are not generally barred by the political question doctrine derives from an erroneous reading of *Baker v. Carr*. *Baker* involved an equal-protection challenge to Tennessee's apportionment statute. Tennessee argued that apportionment cases, regardless of how the litigants characterized the case, can implicate no constitutional provision except the Guarantee Clause and that such claims present non-justiciable political questions. *Baker*, 369 U.S. at 209. In explaining that equal protection challenges to apportionment statutes were justiciable, the Supreme Court clarified that previous Guarantee Clause claims were considered non-justiciable not because they "touch[ed] upon matters of state governmental organization," but because

8

such claims involve at least one of the six factors that make up the political question doctrine. *Id.* at 218. The panel reads this clarification as a rejection of the general rule that Guarantee Clause claims are non-justiciable. But nowhere in *Baker* does the Supreme Court retreat from previous cases holding that Guarantee Clause claims are non-justiciable—the Court simply explained *why* Guarantee Clause claims have always been found non-justiciable. Indeed, the Court's explanation of the non-justiciability of Guarantee Clause claims strongly suggests the Court held that such claims *always* involve political questions. *Id.* ("We shall discover that Guaranty Clause claims involve those elements which define a 'political question,' and for that reason and no other, they are nonjusticiable.").

In addition to recognizing this general rule, the Supreme Court has already held that challenges to state-level direct democracy provisions under the Guarantee Clause are non-justiciable. In *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912), the Supreme Court held that a Guarantee Clause challenge to a tax increase enacted through Oregon's initiative and referendum process was non-justiciable because the Constitution confers only on Congress the power to determine whether a state government is republican in form. *Id.* at 150–51 (holding it is "the [federal] legislative duty to determine the political questions involved in deciding whether a state government republican in form exists").

The panel distinguishes *Pacific States* by arguing the lawsuit in that case

9

was a "wholesale attack[] on the validity of a state's government rather than . . . a challenge to a single provision of a state constitution." *Kerr*, 744 F.3d at 1173 (citing *Pacific States*, 223 U.S. at 150 ("[T]he assault which the contention here advanced makes is not on the tax as a tax, but on the state as a state.")). The panel maintains that, in contrast to *Pacific States*, the issue in this case is only whether "one provision of the Colorado Constitution brings it below a constitutionally mandated threshold." *Id.* at 1173 n.11.

I do not think this is a meaningful distinction. The Guarantee Clause presents a dichotomy: either a state government is republican in form (and thus a "valid" government) or it is not. The plaintiffs in this case have alleged that TABOR is inconsistent with the Guarantee Clause. In other words, TABOR renders the Colorado government non-republican in form.

In *Pacific States*, the Supreme Court explained the petitioners' claim called into question the validity of not only the particular tax statute adopted by referendum, but "every other statute passed in Oregon since the adoption of the initiative and referendum" because they were passed by a government not republican in form. 223 U.S. at 141. This description may have been somewhat hyperbolic, considering the wide discretion courts have to fashion the appropriate remedy, but its logic is equally applicable to the claim in this case. Ultimately, the essence of the claims in *Pacific States* and in the case before us—that a state constitution's direct democracy provision renders the state government non-

10

republican in form—is the same. The Court squarely held that this question is textually committed to Congress. *Id.* at 150–51.

Moreover, the panel's opinion does not expressly find that there are "judicially discoverable and manageable standards" for resolving the case; it simply assures the reader that judicially manageable standards *might* emerge at a future stage of litigation. The panel gives no support for its conclusion besides a comparison to *District of Columbia v. Heller*, 554 U.S. 570 (2008), where the Supreme Court was able to determine the meaning and scope of the Second Amendment based on a detailed historical inquiry. The panel is confident that the parties will be able to produce materials that will allow for a similar inquiry into the meaning of the Guarantee Clause.

But the requirement that there be "judicially discoverable and manageable standards" is driven by more than concerns about the difficulty of a historical inquiry. Instead, this *Baker* factor requires a court to determine whether it can decide a legal issue in a way that is "principled, rational, and based upon reasoned distinctions." *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion). The majority gives us nothing besides a mere assurance that the Guarantee Clause contains standards allowing for a principled and rational application that remain to be found. But the panel's failure to at least hint at what the relevant standards are for Guarantee Clause litigation deprives the litigants and district court of necessary guidance as to how these claims are to be

11

adjudicated.

The sharp dichotomy in the Guarantee Clause between republican and non-republican forms of government is all the more reason for concern in this case. The judicial line-drawing that will be required to determine whether a direct democracy provision renders a state government non-republican in form leads me to doubt that a court can decide this case in a way that is "principled, rational, and based upon reasoned distinctions."

* * *

Because the panel's opinion is inconsistent with Supreme Court precedent on legislative standing and the non-justiciability of the Guarantee Clause, I would have granted the Governor's petition for rehearing en banc.

12-1445, *Kerr v. Hickenlooper*

**GORSUCH**, Circuit Judge, dissenting from the denial of rehearing *en banc*.

Everyone knows that before a federal court may decide a dispute "judicially manageable standards" must exist for doing so. Federal judges aren't free to intervene in any old dispute and rule any way they wish. Legislatures may act in ways that are "inconsistent, illogical, and ad hoc." *Vieth v. Jubelirer*, 541 U.S. 276, 278 (2004) (plurality opinion). But the "judicial Power" extended by Article III, §1 to the federal courts imposes on us the duty to act "in the manner traditional for English and American courts." *Id.* And "[o]ne of the most obvious limitations imposed by that requirement is that judicial action must be governed by *standard*, by *rule*" — or, put differently, federal courts must be able to proceed in a "principled, rational, and . . . reasoned" fashion. *Id.* Unless judicially manageable standards for decision exist, we have no business intervening. *Id.*; *see also Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012).

Where are the judicially manageable standards for deciding this case? The burden of showing such standards exist usually presents a plaintiff with little trouble. Most cases in federal court — whether arising under congressional legislation or the common law or sounding in equity — come with ample principles and precedents for us to apply in a reasoned way, even if those principles and precedents don't always dictate a single right answer. But in our case the plaintiffs make a rather novel claim: they contend that Colorado's government is not a republican one — and so violates the Guarantee Clause —

because tax increases proposed by the legislature must also be approved by the public.  Where are the legal principles for deciding a claim like *that*?

The plaintiffs don't say.  They don't suggest, for example, that the Clause requires all decisions about legislation to be made by elected representatives rather than the public.  Neither do they contend that the Clause is offended only when all legislative decisions are made by direct democracy.  If the Constitution could be said to contain one or the other of these rules — either forbidding any experiment with direct democracy or forbidding only the total loss of a representative legislature — we might have a principled basis for deciding the case.  The former rule of decision might require judgment for the plaintiffs; the latter, for the defendants.  But the plaintiffs in our case disclaim either such standard.  They seem to acknowledge that *some* direct democracy is consistent with republican government, insisting only and instead that the kind *here* runs afoul of the Constitution.

And this is where we run into trouble.  To date, the plaintiffs have declined to advance *any* test for determining when a state constitutional provision requiring direct democracy on one subject (here, taxes) does or doesn't offend the Clause.  No doubt, the task the plaintiffs face is a formidable one:  they enter a field in which the Supreme Court has already dismissed for lack of judicially manageable standards a case challenging a state constitutional provision that allowed citizens to overturn by direct vote *any* state legislative enactment (not

just enactments raising taxes). *See Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912). The plaintiffs enter a field, too, where the Supreme Court has more recently chosen to derive a multi-part justiciability test from its preexisting Guarantee Clause jurisprudence — in the process expressly reaffirming the idea that the Clause lacks judicially manageable standards for cases like ours. *See Baker v. Carr*, 369 U.S. 186, 223 (1962) (noting that the Court has "refused to resort to the Guaranty Clause . . . as the source of a constitutional standard for invalidating state action" in many cases, including one involving the "claim that initiative and referendum negated republican government").

But even if the plaintiffs could somehow surmount these precedential problems and colorably contend that judicially manageable standards exist for deciding their case, they haven't even *tried*. Three years of litigation have slipped by. During that time the parties have exhausted no fewer than three rounds of pleadings in the district court and an interlocutory appeal in this one. At every stage Governor Hickenlooper has challenged the plaintiffs to identify judicially manageable standards of decision that might empower an Article III court to decide their case. Yet even today the plaintiffs profess no more than "confiden[ce]" that if their case is allowed to proceed still further the district court will someday be able to find some standard for decision. Appellees' Br. 28. For their part, the district court and the panel have allowed the case to proceed on this same sanguine hope — all while following the plaintiffs' lead and

-3-

conspicuously declining to identify any principled standard for decision. *See*

Panel Op. 39-42; App. at 449 (district court opinion).[1]

In one sense, this shortcoming may be unimportant. On remand, after all,

the district court remains very likely to dismiss this case — eventually — either

for lack of manageable standards or on the merits. The plaintiffs' failure for so

long to identify any legal standards for deciding their own case pretty strongly

suggests there aren't any — or that what standards the Guarantee Clause may

contain won't prove favorable to them. Indeed, this hypothesis is fully borne out

by the scholarly literature on the Clause's text and original meaning. Much of

which suggests that the Clause may rule out a state monarchy, a smaller amount

of which suggests the Clause may rule out a complete direct democracy, but none

of which credibly suggests a limited dose of direct democracy of the sort at issue

here is constitutionally problematic.[2] Indeed, to hold for plaintiffs in this case

---

[1] In expressing confidence that judicially manageable standards might yet pop up, the panel opinion leaned primarily on the argument that because manageable standards were found in the Second Amendment to decide *District of Columbia v. Heller*, 554 U.S. 570 (2008), manageable standards are sure to be found in the Guarantee Clause to decide this case. *See* Panel Op. 40-41. But that, of course, commits the logical fallacy of overgeneralization. Just because one clause of the Constitution contains manageable standards to decide one case doesn't mean another clause contains manageable standards for deciding another case. *See, e.g.*, *Vieth*, 541 U.S. at 281; *id.* at 313 (dismissing political gerrymandering challenge because plaintiffs failed to carry their burden of showing judicially manageable standards existed for deciding it).

[2] *See, e.g.*, Robert G. Natelson, *A Republic, Not a Democracy? Initiative, Referendum, and the Constitution's Guarantee Clause*, 80 Tex. L. Rev. 807, 811 n.19 (2002); G. Edward White, *Reading the Guarantee Clause*, 65 U. Colo. L.

would require a court to entertain the fantasy that more than half the states (27 in all) lack a republican government. *See* Appellant's Br. 8.

Even so, it's hard to look away — to ignore the failure of the plaintiffs, the district court, or the panel to identify any standard for decision — and conclude nothing of significance has happened here. The Supreme Court has plainly instructed that "[w]hen a court is given no standard by which to adjudicate a dispute . . . resolution of the suit is beyond the judicial role envisioned by Article III." *Zivotofsky*, 132 S. Ct. at 1432. Yet three years into this case and many challenges later and still no one has ventured any standard for deciding this dispute. It would seem time — past time — to say the plaintiffs have not carried their burden of establishing that this case lies within our power to decide under Article III. After all, this isn't some prosaic question of fact that can be resolved by deposing a legislator-plaintiff or sending an interrogatory to the Governor: no amount of fact discovery can remedy the plaintiffs' shortcomings in this case. We face an Article III issue and a question of law, one the plaintiffs bear the burden of answering but one they have not borne.

---

Rev. 787, 803-06 (1994); Akhil Reed Amar, *The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem*, 65 U. Colo. L. Rev. 749, 749-52, 761-73 (1994); Jonathan Toren, *Protecting Republican Government from Itself: The Guarantee Clause of Article IV, Section 4*, 2 N.Y.U. J.L. & Liberty 371, 374-92, 392-99 (2007); Brief for Amici Independence Institute and Cato Institute 12-26.

As things stand, the panel opinion assigns the litigants and the district court to a kind of litigation limbo — the promise of many more years wrestling with this case all without a wisp of an idea what rule of law might govern its disposition. That seems no small wrong to impose on any litigant in any case, but it is perhaps an especially unseemly wrong to impose on the state's highest elected official in a case calling into question a state constitutional amendment. Federalism and comity appear to count for little when we condemn a state, its governor, and its constitution to a multi-year scavenger hunt up and down the federal court system looking for some judicially manageable standard that might permit us to entertain the case in the first place.

The situation we confront in this case is more than a little reminiscent of the one the Supreme Court faced in *Vieth*, where the plaintiffs sought to challenge a political gerrymander as unconstitutional. There, 18 years of experimenting by various courts failed to yield any sure standards for litigating those sorts of cases. Here, we encounter an arguably longer history of failed efforts to develop standards for litigating Guarantee Clause cases involving individual citizen initiatives — one extending into the nineteenth century. There, the plaintiffs sought to identify and defend as workable their own set of legal standards at the motion to dismiss stage, but the Court found those efforts unavailing and affirmed the dismissal of the complaint. Here, the plaintiffs haven't even *attempted* to identify workable legal standards for adjudicating their case despite many

opportunities over many years.  If the law's promise of treating like cases alike is to mean something, this case should be put to bed now as *Vieth*'s was then, rather than being destined to drag on forlornly to the same inevitable end.  I respectfully dissent.